**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **GPT GLENDALE, INC., a Delaware corporation,** <br> **Plaintiff,** <br> **v.** <br> **KENTEK CORPORATION, a New Hampshire corporation;** <br> **WILLIAM L. ARTHUR, an individual resident of New Mexico;** <br> **BONNIE G. SIMMONS, an individual resident of New Hampshire, and** <br> **RICHARD L. PELLEGRINI, an individual resident of Florida,** <br> **Defendants.** | ) | CA 06 334 <br> **Case No.** <br> **TRIAL BY JURY DEMANDED** |

**VERIFIED COMPLAINT**

Plaintiff GPT Glendale, Inc. ("GPT Glendale"), by counsel and pursuant to Rule 3 of the Federal Rules of Civil Procedure, respectfully states as follows for its Complaint against Defendants Kentek Corporation ("Kentek"), William L. Arthur ("Arthur"), Bonnie G. Simmons ("Simmons"), and Richard L. Pellegrini ("Pellegrini"):

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and there is complete diversity.

2. This Court has original jurisdiction over GPT Glendale's Lanham Act claims for trademark infringement and unfair competition, Counts I and III respectively, pursuant to 15 U.S.C. §§ 1114 and 1125(a) and 28 U.S.C. §§ 1331 and 1338.

3. This Court has original jurisdiction over GPT Glendale's claims for patent infringement, Count XI, pursuant to 28 U.S.C. § 1338(a) and 35 U.S.C. §§ 271 and 281.

4. Additionally, this Court has jurisdiction over Counts II and IV through X under the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. § 1367, on the grounds that said claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) and (b), as GPT Glendale has its principal place of business in Rhode Island and a substantial part of the events and omissions giving rise to these claims occurred in Rhode Island. Venue in this Court is also proper for GPT Glendale's patent infringement claims against Kentek pursuant to 28 U.S.C.§ 1391(c).

## PARTIES

6. GPT Glendale is a corporation organized and existing under the laws of the State of Delaware. GPT Glendale has its principal place of business in Smithfield, Rhode Island. GPT Glendale is a subsidiary of PPE Holdings, Inc. ("PPE Holdings"), which is itself a subsidiary of Bacou-Dalloz Safety, Inc. ("Bacou-Dalloz Safety"). Bacou-Dalloz Safety is in turn a subsidiary of Bacou-Dalloz USA, Inc. ("Bacou-Dalloz USA").

7. Kentek is a corporation organized and existing under the laws of the State of New Hampshire. Kentek has its principal place of business at One Elm Street, Pittsfield, New Hampshire 03263.

8. Arthur is a former General Sales Manager for Lase-R-Shield, an unincorporated division of GPT Glendale, and Territory Sales Manager of GPT Glendale. Arthur currently works on behalf of, acts for the benefit of, or is otherwise associated with Kentek in violation of

his contractual obligations to GPT Glendale. Arthur resides at 809 Monroe Street, N.E., Albuquerque, New Mexico 87110-6313.

9. Simmons is a former Materials Specialist for GPT Glendale who currently works for Kentek. Simmons resides at 185 E. Side Drive, Concord, New Hampshire 03301-5465.

10. Pellegrini is a former Vice President of GPT Glendale whom Kentek has retained as a consultant. Pellegrini resides at 1501 Grasslands Boulevard, Lakeland, Florida 33803.

## NON-PARTY CO-CONSPIRATORS

11. Steven R. Carr ("Carr") is a former Production Manager for GPT Glendale and currently works as a consultant for Kentek. Carr resides at 106 Valentine Circle, Warwick, Rhode Island 02886.

12. Karen R. Brown ("Brown") is a former Administrative Assistant for GPT Glendale's Lase-R-Shield business as defined herein and currently works for Kentek. Brown resides at 7019 Santa Elena Street, N.E., Albuquerque, New Mexico 87113.

## FACTS COMMON TO ALL COUNTS

### Overview of GPT Glendale's Business

13. GPT Glendale designs and manufactures protective eyewear and specialty filters. These products are used in various industries (including, among others, the medical and automotive industries) as well as in the military. GPT Glendale's principal product is laser protective eyewear.

14. GPT Glendale's polymer laser eyewear products are made using dyes. The properties and performance of each product are determined largely by that product's dye. The dye used for each product is extruded into pellets made of polymer, which are then molded into particular eyewear products.

15. The dye for each product is made from commercially available products, but the dye formula, the bill of materials, and the source of supplies for each laser eyewear product are all proprietary to GPT Glendale. GPT Glendale takes measures that are reasonable under the circumstances to ensure that unauthorized persons do not have access to the foregoing proprietary information. Those reasonable security measures include employee policies regarding the protection of confidential information, the use of confidentiality agreements with certain employees, the disclosure of confidential information within the company only on a "need to know" basis, and the storage of certain materials — in both hard copy and electronic form — in secure areas.

16. GPT Glendale's products are manufactured at the company's manufacturing facility in Smithfield, Rhode Island.

17. Medical laser manufacturers are GPT Glendale's major customers. Other principal customers are doctors, hospitals, surgery centers, spas, and industrial distributors.

18. GPT Glendale sells its products directly to laser equipment manufacturers and relies on distributors for sales in other market channels.

19. Lase-R-Shield acts as GPT Glendale's distribution arm for the distribution of GPT Glendale's products throughout the United States.

**GPT Glendale's Contracts with Kentek for the Distribution of GPT Glendale Products and the Potential Acquisition of Lase-R-Shield**

20. In or around 1997, GPT Glendale entered into a distributorship relationship with Kentek for the sale of GPT Glendale's products. As is GPT Glendale's practice, the distributorship relationship was not memorialized in a written distributor agreement. The distributorship relationship was of indefinite duration and was terminable at will.

21. For at least five years before April 14, 2006, Kentek was GPT Glendale's largest outside distributor of GPT Glendale products. Kentek thus competed with GPT Glendale's Lase-R-Shield business unit for the distribution of laser protective eyewear.

22. In 2002, Kentek expressed an interest in purchasing Lase-R-Shield from GPT Glendale. In conjunction with the potential sale of Lase-R-Shield, GPT Glendale and Kentek entered into the November 22, 2002 Mutual Confidentiality Agreement (the "Lase-R-Shield Confidentiality Agreement"). The Lase-R-Shield Confidentiality Agreement is attached hereto as **Exhibit A**.

23. Pursuant to the Lase-R-Shield Confidentiality Agreement, Kentek agreed to hold all Confidential Information, as defined by the agreement, received from GPT Glendale in strictest confidence for a period of five (5) years from the date of disclosure, not to divulge such information to any third party, and not to use such information for any purpose other than as agreed to by the parties.

24. Negotiations surrounding the sale of Lase-R-Shield continued on and off for approximately two years. During that time, GPT Glendale — pursuant to the Lase-R-Shield Confidentiality Agreement — provided Kentek with confidential and proprietary business information. This information, disclosed for the sole purpose of allowing Kentek to evaluate the potential purchase of Lase-R-Shield, included an overview of the Lase-R-Shield business and its customers.

25. In 2004, Kentek informed GPT Glendale that it was no longer interested in purchasing Lase-R-Shield and broke off all negotiations.

26. Since terminating negotiations surrounding the potential purchase of Lase-R-Shield, Kentek has been improperly using GPT Glendale's proprietary materials disclosed

pursuant to the Lase-R-Shield Confidentiality Agreement to develop its own business and to compete directly with GPT Glendale.

27. Since terminating negotiations surrounding the potential purchase of Lase-R-Shield, Kentek has actively sought to hire away from GPT Glendale members of GPT Glendale's senior management and other employees (including the entire competing Lase-R-Shield sales unit). Kentek's efforts have succeeded. Beginning in 2005, at least five GPT Glendale employees have resigned from GPT Glendale and accepted employment or consulting positions with Kentek. These individuals include Arthur, Pellegrini, Simmons, Carr, and Brown.

28. Moreover, Kentek has employed unfair and deceptive trade practices with the intent of harming GPT Glendale's business and enhancing that of Kentek. These unfair and deceptive practices include:

a. misappropriating GPT Glendale's trade secrets by accepting from former GPT Glendale employees confidential and proprietary information concerning GPT Glendale's business and products;

b. making improper use of GPT Glendale's trade dress and product numbers to effectuate a "bait and switch" between GPT Glendale's products (the "bait") and Kentek's products (the "switch");

c. providing false and misleading information to GPT Glendale's current and potential customers regarding the availability of GPT Glendale's products; and

d. tortiously interfering with GPT Glendale's business relationships by advising GPT Glendale's current and potential customers not to purchase GPT Glendale products because Kentek will soon be coming out with "knock-off" products identical to and cheaper than those offered by GPT Glendale.

**Kentek Begins to "Hire Away" GPT Glendale Employees**

29. On March 31, 2000, Arthur executed an Employment Agreement (the "Arthur Employment Agreement") with Bacou USA Safety, Inc. ("Bacou USA Safety"). The laser eyewear business of Bacou USA Safety was assigned to GPT Glendale at a later time. A true and correct copy of the Arthur Employment Agreement is attached hereto as **Exhibit B**.

30. The Arthur Employment Agreement contains provisions intended to protect GPT Glendale's confidential and proprietary information. These provisions include Section 6 of the Arthur Employment Agreement, entitled "Non-Disclosure of Information." By signing the Arthur Employment Agreement, and in consideration of his ongoing employment by the "Company" that is now GPT Glendale, Arthur agreed as follows with respect to "Non-Disclosure of Information":

> It is understood that the business of Company and its affiliates is of a confidential nature. During the period of Employee's employment with Company, Employee may have received and he may receive Confidential Information ... concerning Bacou USA, Inc., Company or any of their affiliates, subsidiaries or third party contractors which, if disclosed, would damage such entities. Employee agrees that during the periods that this Agreement is in effect and thereafter he will not ... directly or indirectly, divulge, disclose or appropriate to his own use, or to the use of any third party, any Confidential Information obtained by him during the term hereof. For the purposes of this Agreement, "Confidential Information" shall include, but shall not be limited to any secret, proprietary or confidential information or knowledge pertaining to trade secrets, systems, manuals, confidential reports, methods, processes, designs, equipment lists, operating procedures, business records (e.g. financial, vendor, customer and employee records) and customer lists. Upon termination of his employment, Employee shall promptly deliver to Company all materials owned by Employee and all Confidential Information that is, directly or indirectly, in the possession or under the control of Employee. The provisions of this paragraph shall continue to apply for an unlimited period of time (or, if shorter, the maximum period permissible under applicable law) after Employee ceases to be employed by Company.

31. The Arthur Employment Agreement also contains provisions intended to protect GPT Glendale from competition by Arthur during the term of his employment and, at the option of GPT Glendale, for a period of up to one year following the termination of his employment. These provisions include Section 9(a) of the Arthur Employment Agreement, entitled "Non-Competition." By signing the Arthur Employment Agreement, and in consideration of his ongoing employment by the "Company" that is now GPT Glendale, Arthur agreed as follows with respect to "Non-Competition":

> During the period that this Agreement is in effect and, at Company's option, for a period of up to one year after its termination, Employee agrees that he will not within the geographical area of the United States, engage, either directly or indirectly, individually or as an owner, partner, joint venturer, employee, officer, director, stockholder, consultant, independent contractor or lender of or to any corporation, holding company or other business entity which is in a business similar to that of Bacou USA, Inc., Company or any of their subsidiaries or affiliates. ... In the event that Company chooses to exercise its non-competition option with respect to Employee ... Company shall notify Employee in writing within five (5) business days following the later of his last day of employment or the date on which Company receives notice of the identity of his new employer. Such notice shall specify the period of up to one year following termination of the Agreement, during which time Employee shall be prohibited from engaging in activity that is competitive with that of Bacou USA, Inc., Company or any of their subsidiaries or affiliates. In the event that Company exercises its non-competition option, Company shall continue to pay Employee his Base Salary at the rate applicable at the time of termination for the non-competition period, provided, however, that Company shall not be obligated to make any such payments (and shall be entitled to a refund of any payments actually made) to the extent that Employee violates his obligation of non-competition or invalidates such obligation through legal action.

32. The Arthur Employment Agreement also contains provisions intended to protect GPT Glendale from Arthur's solicitation of other GPT Glendale employees during the course of his employment and for three years thereafter. These include the "Non-Solicitation" provisions of Section 9(b) of the Arthur Employment Agreement. By signing the Arthur Employment

Agreement, and in consideration of his ongoing employment by the "Company" that is now GPT Glendale, Arthur agreed as follows with respect to Non-Solicitation:

> Employee shall not during the time that this Agreement is in effect, and for a period of three (3) years thereafter, employ, solicit for employment or arrange to have any other person or entity employ or solicit for employment any person who is or was employed by Company or any of its subsidiaries or affiliates for other employment or induce any employee or former employee to terminate his or her employment with Company or such subsidiary or affiliate.

33. Section 14 of the Arthur Employment Agreement states that the agreement "shall be binding upon and shall inure to the benefit of the parties and their respective heirs, personal representatives, successors and assigns." GPT Glendale is the successor-in-interest to the laser eyewear business of Bacou USA Safety. As such, GPT Glendale is entitled to all of the rights of Bacou USA Safety under the Arthur Employment Agreement. These include the right to enforce the Non-Disclosure of Information, Non-Competition, and Non-Solicitation provisions of the Arthur Employment Agreement, by initiation of this action against Arthur and otherwise.

34. By letter dated February 28, 2006 (the "Arthur Resignation Letter"), Arthur gave notice that he intended to terminate his employment effective June 1, 2006, and to enter into an employment relationship with Kentek. A true and correct copy of the Arthur Resignation Letter is attached hereto as **Exhibit C**.

35. By sending the Arthur Resignation Letter, Arthur became the fourth GPT Glendale employee within a year to leave (or to announce the intention to leave) GPT Glendale and to become associated with, or begin working for the benefit of, Kentek. Previously, two other GPT Glendale employees — Simmons and Carr — had resigned from GPT Glendale and had begun either working or consulting for Kentek. Additionally, on or about February 28, 2006, Brown, Arthur's main assistant at GPT Glendale's Lase-R-Shield business, resigned from

GPT Glendale and opened Kentek's new sales office located in Albuquerque, New Mexico (the "Albuquerque Office").

36. By letter dated May 2, 2006 (attached hereto as **Exhibit D**), GPT Glendale notified Arthur that it had elected to exercise its non-competition option under the Arthur Employment Agreement. In the May 2, 2006 letter, GPT Glendale notified Arthur that he:

a. would remain employed by GPT Glendale through December 31, 2006;

b. would be prohibited from engaging in any activity competitive with that of GPT Glendale before December 31, 2006; and

c. would continue to receive his base salary through December 31, 2006.

37. In violation of the Arthur Employment Agreement, Arthur began working at, acting for the benefit of, and/or directing customers to the Albuquerque Office while remaining on the payroll of GPT Glendale.

38. Before he began working at, or acting for the benefit of, Kentek, Arthur had spent several months as a GPT Glendale employee planning for his move to Kentek and usurping GPT Glendale's business opportunities for the benefit of Kentek. Examples of Arthur's competitive activities on behalf of Kentek while continuing to receive a paycheck from GPT Glendale include the following:

a. Arthur purposefully failed to update GPT Glendale's customer database with information about current and prospective customers of GPT Glendale; and

b. rather than sell a GPT Glendale product, Arthur referred his second largest customer (Alcon Surgical) to Kentek for a new eyewear product that Kentek was at the time still developing.

39. By letter dated March 23, 2006 (the "Notice of Proprietary Rights"), GPT Glendale put Kentek on notice of Arthur's actions and violations of the Arthur Employment Agreement. The Notice of Proprietary Rights also apprised Kentek of the fact that, if Kentek hired Arthur, Kentek would be the recipient of trade secrets that are the valuable intellectual property of GPT Glendale. A true and correct copy of the Notice of Proprietary Rights is attached hereto as **Exhibit E**.

40. Through counsel, Kentek made a general denial of the Notice of Proprietary Rights, while failing to refute any of its specific factual allegations. Meanwhile, Kentek — acting through Tom MacMullin, its President and General Manager — attempted to placate GPT Glendale by sending a letter, dated March 28, 2006 (attached hereto as **Exhibit F**). In Kentek's March 28, 2006 letter, Mr. MacMullin offered to meet with GPT Glendale "in person to review our plans and discuss the removal of the growing number of obstacles which inhibit our ability to sell Glendale products." In an effort to forestall any action from GPT Glendale, Kentek stated further:

> We believe a disruption in service will create greater opportunity for low-cost, low-quality suppliers to further strengthen their position. You and I may decide that some of our differences will remain, but I am confident we can agree on action that will mutually benefit both Kentek and Bacou-Dalloz.

41. As of the date of its March 28, 2006 letter, Kentek was already engaged in the scheme described herein. As part of that scheme, Kentek had previously hired Simmons, a former Materials Specialist for GPT Glendale.

42. While at GPT Glendale, Simmons coordinated planning for the production of GPT Glendale's products. Simmons had access to GPT Glendale's sources of supply, and the formulas, bills of material, and product history for each of the various dyes used to make GPT

Glendale's products. Simmons also had access to contact information for GPT Glendale's suppliers of the ingredients for the dyes.

43. After leaving the employ of GPT Glendale, Simmons — without GPT Glendale's consent or approval, and contrary to her obligations to GPT Glendale — brought confidential and proprietary GPT Glendale information with her to Kentek.

44. After leaving the employ of GPT Glendale, Simmons requested that one of GPT Glendale's vendors of a metal eye cap used to protect patients during laser procedures produce for Kentek a product identical to that which the vendor manufactures for GPT Glendale. That particular vendor refused to do so.

45. Other employees of GPT Glendale that Kentek hired as part of its predatory scheme include the following individuals who had access to the following confidential, proprietary information of GPT Glendale:

a. Pellegrini, who knew the identity of key vendors, the proprietary process by which — using dyes and molding laser products — GPT Glendale manufactures laser eyewear, and how various aspects of the process are brought together to manufacture products for distribution;

b. Carr, who — having been hired by GPT Glendale in 1997 to oversee the transfer of glass filter manufacturing from Albuquerque, New Mexico, to Smithfield, Rhode Island — knew all aspects of GPT Glendale's glass filter laser business; and

c. Brown, who — having been with Lase-R-Shield before its acquisition by Bacou USA Safety in 1997 — knew the identity of all major customers of GPT Glendale's Lase-R-Shield business and had access to proprietary customer data.

**GPT Glendale Terminates Its Distribution Relationship with Kentek**

46. As of April 2006, GPT Glendale had become aware that Kentek representatives were informing GPT Glendale customers not to purchase GPT Glendale products, but instead to wait until Kentek had its own brand of competitive products available for sale.

47. By letter dated April 11, 2006 (the "Notice of Termination") (attached hereto as **Exhibit G**), GPT Glendale notified Kentek that — effective at the close of business on April 14, 2006 — Kentek would be terminated as an authorized distributor of GPT Glendale products. The Notice of Termination also informed Kentek that GPT Glendale was willing to repurchase any unsold inventory of GPT Glendale brand products that Kentek wished to sell back to GPT Glendale through May 14, 2006.

48. The Notice of Termination applied to GPT Glendale's entire relationship with Kentek, including not only the GPT Glendale brand products, but also the "Kentek private branded … products" that GPT Glendale had previously supplied to Kentek.

49. Despite the termination of Kentek's status as an authorized distributor of GPT Glendale products, Kentek continues to advertise GPT Glendale products on its website. GPT Glendale products are sold only through authorized distributors. Until recently, Kentek was an authorized distributor of GPT Glendale products. Kentek's continued advertising of GPT Glendale products in interstate commerce is therefore likely to confuse and deceive customers that Kentek is still an authorized distributor.

50. Despite the fact that it was terminated in April 2006 as an authorized distributor of GPT Glendale products, Kentek only recently began to take steps to de-identify from the GPT Glendale products or to otherwise inform its customers that it is no longer an authorized distributor of GPT Glendale products.

51. By letter dated May 24, 2006 (the "Notice of De-Identification") (attached hereto as **Exhibit H**), GPT Glendale notified Kentek that the deadline for Kentek to sell off any remaining GPT Glendale inventory after the termination of its GPT Glendale distributorship had passed. In the Notice of De-Identification, GPT Glendale demanded that Kentek make no further sales of existing GPT Glendale products and immediately cease advertising the sale of GPT Glendale products on its website and elsewhere in any Kentek literature. GPT Glendale further demanded that Kentek remove all references to GPT Glendale products from Kentek's website, including references to those GPT Glendale products being passed off as Kentek products and those Kentek products being passed off as GPT Glendale products. The Notice of De-Identification further requested that Kentek provide written confirmation — no later than June 1, 2006 — that it had complied with GPT Glendale's demands. No such written confirmation has been provided by Kentek. To the contrary, as of the date of filing this Complaint, Kentek continues to display GPT Glendale products on its website.

**Kentek's Other False and Deceptive Business Practices**

52. At an April 2006 trade show of the American Society of Laser Medicine and Surgery held in Boston, Kentek used a new booth design that featured prominently GPT Glendale products.

53. Kentek's continuing use of this design will confuse and deceive customers into believing that Kentek is still an authorized distributor of GPT Glendale laser eyewear products. Such use is also a "bait and switch": Kentek uses the GPT Glendale products as "bait" to attract customers and then "switch" them to Kentek's knock-off products. Kentek carries out these deceptive practices in interstate commerce.

54. At the April 2006 trade show, a Kentek representative informed a representative of Innovative Optics, one of GPT Glendale's distributors, that Innovative Optics should "hold off" on purchasing GPT Glendale products for distribution because Kentek was about to introduce its own line of competing products.

55. Since February 2005, Kentek has been introducing laser eyewear protection products to the market that compete directly with the GPT Glendale products for which Kentek has been an authorized distributor. To manufacture these products, Kentek uses an Asian supplier, Pyramex.

56. On May 25, 2006, a GPT Glendale customer, Pratt & Whitney, attempted to order a GPT Glendale product, model number 31-70101, through Kentek. Kentek informed Pratt & Whitney that it would take six to nine weeks before this item would be available. Pratt & Whitney contacted GPT Glendale to inquire about the delay, informing GPT Glendale that in the past Kentek had filled its orders for GPT Glendale products quickly.

57. The information that Kentek provided Pratt & Whitney on May 25, 2006 was false and misleading. At that time, Kentek failed to inform Pratt & Whitney that Kentek was no longer an authorized distributor of GPT Glendale products. Instead, Kentek falsely insinuated that it was still a GPT Glendale distributor but that it would not be able to fill the order for six to nine weeks.

58. Had Kentek remained an authorized GPT Glendale distributor it could have filled Pratt & Whitney's order for product number 31-70101 in as few as three (3) days.

59. Kentek representatives have also falsely informed GPT Glendale customers that GPT Glendale's Laser-Aid product has been discontinued, and that Kentek has cheaper and more

user-friendly products coming on the market. Kentek, until recently, reinforced this "bait and switch" by only showing GPT Glendale's Laser-Aid product on its website, not its own product.

60. By informing GPT Glendale's customers that they will not be able to obtain GPT Glendale products in a timely manner, and by informing GPT Glendale's customers that GPT Glendale products have been discontinued, Kentek is attempting to dissuade GPT Glendale customers from ordering GPT Glendale products. By doing so, Kentek is causing severe damage to GPT Glendale's business and reputation in the industry.

**The GLENDALE Marks**

61. GPT Glendale is the owner of various trademarks (collectively, the "GLENDALE Marks") on the Principal Register of the United States Patent and Trademark Office (the "PTO"). Through widespread use, sales, advertising, and promotion, the GLENDALE Marks have become famous and have earned wide renown as identifiers of laser protective eyewear. This fame and renown have inured to the benefit of GPT Glendale's business reputation. As the cornerstone of GPT Glendale's distribution network, the GLENDALE Marks are among GPT Glendale's most valuable assets.

62. The GLENDALE Marks include U.S. Reg. No. 2,784,910, registered November 18, 2003, on the Principal Register, for the mark LASER-AID® for eye patches for medical use (the "LASER-AID® Mark"). GPT Glendale's registration of the LASER-AID® Mark remains in full force and effect. Under 15 U.S.C. §§ 1057(b) and 1115(a), the registration is *prima facie* evidence of the validity of the LASER-AID® Mark, of GPT Glendale's ownership of the LASER-AID® Mark, and of GPT Glendale's exclusive right to use the LASER-AID® Mark in commerce on or in connection with the goods specified in the registration.

63. The PTO issued the registration of the LASER-AID® Mark to GPT Glendale based on an application filed on June 27, 2002. GPT Glendale's application was based on an intent to use the LASER-AID® Mark in commerce for the specified goods. Under 15 U.S.C. § 1057(c), the filing of GPT Glendale's intent-to-use application effected a constructive use of the LASER-AID® Mark as of the application filing date. The filing also conferred on GPT Glendale a right of priority, nationwide in effect, on or in connection with the goods specified in the registration. The registration also constitutes constructive notice of GPT Glendale's claim of ownership of the LASER-AID® Mark under 15 U.S.C. § 1072.

64. In January 2003, GPT Glendale commenced actual use of the LASER-AID® Mark. Since then, GPT Glendale has made continuous use of the LASER-AID® Mark throughout the United States (including in the State of Rhode Island) in connection with the advertising, promotion, sale, and offering of GPT Glendale's eye patches for medical use. These products take the form of disposable laser eye shields.

65. The LASER-AID® Mark is of significant value to GPT Glendale as an identifier of source in connection with the promotion, sale, and offering of its disposable laser eye shields. The LASER-AID® Mark distinguishes GPT Glendale's products from those of its competitors and others. GPT Glendale has expended significant time, money, and effort to establish recognition in the trade of its LASER-AID® Mark.

**GPT Glendale's Proprietary Product Numbers**

66. GPT Glendale has adopted and used a proprietary numbering system to identify GPT Glendale products, including products identified with the GLENDALE Marks.

67. Customers of GPT Glendale and its authorized distributors associate these proprietary numbers with genuine GPT Glendale products.

**Acts of Unfair Competition and Infringement on Kentek's Website**

68. Since its termination as an authorized distributor of GPT Glendale, Kentek has continued to advertise GPT Glendale products on its website. By continuing to display these products on its website, Kentek deceives customers into thinking that it is still an authorized distributor for GPT Glendale.

69. By continuing to display GPT Glendale products on its website, Kentek is engaged in a deceptive "bait and switch." Customers attracted to Kentek's website by GPT Glendale products are instead supplied products manufactured by Kentek and its Asian supplier, Pyramex.

70. Also displayed on Kentek's website are pictures of LGF, LOTG ("Laser Over The Glass"), and Encore frames that appear identical to the frames displayed on GPT Glendale's website. Encore frames are manufactured by Dioptics, with which GPT Glendale has an exclusive contract.

71. GPT Glendale also had an exclusive contract with Dioptics for another feature of GPT Glendale laser eyewear — a wire core temple that allows the product to be bent and adjusted. In March 2006, Kentek introduced its own wire core temple. Dioptics has informed GPT Glendale that it must increase its volume of purchases from Dioptics to meet competition from other distributors.

72. Following its termination as an authorized distributor for GPT Glendale and up until the latter part of June 2006, Kentek's website also used the designation LASEAID to promote GPT Glendale's LASER-AID® product. Such use occurred in a longer expression, SEPS-LASEAID. Kentek's expression was confusingly similar to GPT Glendale's federally registered LASER-AID® trademark. Customers that contacted Kentek about purchasing GPT

Glendale's LASER-AID® product, which was depicted on Kentek's website, were urged to purchase a supposedly similar substitute product of Kentek that was not, until recently, depicted on Kentek's website. In connection with this substitute product, which it sells and offers for sale in interstate commerce, Kentek also represents and describes the product as being FDA approved. These representations and descriptions are false and misleading. In fact, Kentek's substitute product is not FDA approved. Nor is the product even subject to FDA approval.

73. In addition to Kentek's SEPS-LASEAID product, two others — SEPS-SSBK and SEPS-SSHH — were advertised on Kentek's website as "Kentek's non-laser protection" products. These were not Kentek products — they were GPT Glendale products. The Kentek website also advertised and continues to advertise Kentek "Alignment Filters." The "Alignment Filters" shown on Kentek's website are also GPT Glendale products.

74. The resultant injury to GPT Glendale is compounded by the fact that GPT Glendale is the only major manufacturer of laser protective eyewear that offers a lifetime guarantee on its frames. Customers attracted to similar frame styles offered by Kentek do not receive this lifetime guarantee when they purchase Kentek's substitute products but may be unaware of this fact until they seek to enforce the guarantee.

**COUNT I**
**FALSE REPRESENTATIONS AND UNFAIR COMPETITION**
**IN VIOLATION OF SECTION 43(a) OF THE LANHAM ACT**
**(Against Kentek)**

75. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 as if restated in full herein, and alleges further as follows:

76. Kentek prominently displays and depicts on its website pictures of GPT Glendale products. In some cases, these products are identified by using portions of GPT Glendale part numbers (or portions of part numbers used by predecessors of GPT Glendale); in other cases, the

GPT Glendale products are depicted beside Kentek product numbers and descriptions. Kentek displays GPT Glendale products on its website notwithstanding the fact that Kentek has been terminated as an authorized distributor of GPT Glendale products and the fact that the products actually offered and sold by Kentek in interstate commerce are not genuine GPT Glendale products. Rather, Kentek markets and sells imitations of genuine GPT Glendale products made by other manufacturers.

77. By such actions, Kentek falsely suggests that Kentek's product offerings are GPT Glendale products and that Kentek is part of GPT Glendale's authorized distribution network.

78. These actions are likely to cause confusion, to cause mistake, or to cause deception among purchasers and prospective purchasers by falsely suggesting that Kentek is affiliated with, connected with, or otherwise legitimately associated with GPT Glendale. Such actions also falsely suggest that GPT Glendale sponsors or endorses Kentek, its products, its business, or its commercial activities.

79. Kentek also urged customers interested in purchasing GPT Glendale's LASER-AID® product — which was depicted on Kentek's website — to purchase a supposedly similar substitute product of Kentek that was not, until recently, depicted on Kentek's website. In offering and selling this substitute product in interstate commerce, Kentek also represented and described the product as being FDA approved. These representations and descriptions were false and misleading because Kentek's substitute product is neither FDA approved nor subject to FDA approval.

80. Kentek's deceptive uses of depictions of GPT Glendale products in its advertising, promotional, and sales activities in interstate commerce constitute false descriptions

and false representations as to affiliation, connection, associations, sponsorship, or approval, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

81. As a result of Kentek's false descriptions, false representations, and unfair competition, GPT Glendale has already suffered and will continue to suffer irreparable harm to its business, goodwill, and reputation.

82. In addition, Kentek has derived unlawful gains and profits as a result of its unlawful acts. Kentek's acts of unfair competition have caused and continue to cause GPT Glendale damage in a yet to be ascertained amount.

83. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of Unfair Competition under Section 43(a) of the Lanham Act.

84. This is an exceptional case and GPT Glendale is entitled to recover three times its damages or Kentek's profits plus reasonable attorneys' fees pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

85. If the aforesaid acts are permitted to continue, further loss and damage and irreparable injury will be sustained by GPT Glendale, for which GPT Glendale has no adequate remedy at law.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Kentek to cease violating the Lanham Act as described herein; (2) monetary damages, including, but not limited to, compensatory, special, and enhanced damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

**COUNT II**
**COMMON LAW UNFAIR COMPETITION**
**(Against Kentek)**

86. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

87. Kentek prominently displays and depicts on its website pictures of GPT Glendale products. In some cases, these products are identified by using portions of GPT Glendale part numbers (or portions of part numbers used by predecessors of GPT Glendale); in other cases, GPT Glendale products are depicted beside Kentek product numbers and descriptions. Kentek does so notwithstanding the fact that Kentek has been terminated as an authorized distributor of GPT Glendale products and the fact that the products actually offered and sold by Kentek in interstate commerce are not genuine GPT Glendale products. Rather, Kentek markets and sells imitations of genuine GPT Glendale products made by other manufacturers.

88. By such acts of unfair competition, Kentek falsely suggests that Kentek's product offerings are GPT Glendale products and that Kentek is part of GPT Glendale's authorized distribution network.

89. Kentek's acts of unfair competition are likely to cause confusion, mistake, or deception among purchasers and prospective purchasers, through the false suggestion that Kentek is somehow affiliated with, connected with, or otherwise legitimately associated with GPT Glendale. Such acts also falsely suggest that GPT Glendale sponsors or endorses Kentek, its products, its business, or its commercial activities.

90. Kentek also urged customers interested in purchasing GPT Glendale's LASER-AID® product — which was depicted on Kentek's website — to purchase a supposedly similar substitute product of Kentek that was not, until recently, depicted on Kentek's website. In offering and selling this substitute product in interstate commerce, Kentek also represents and

describes the product as being FDA approved. These representations and descriptions are false and misleading because Kentek's substitute product is neither FDA approved nor subject to FDA approval.

91. The foregoing acts of unfair competition by Kentek constitute false and misleading descriptions and false representations as to the affiliation, connection, association, sponsorship, or approval of Kentek, all in violation of the common law of Rhode Island and other applicable law.

92. Kentek's deceptive practices in promoting and offering products which appear to be GPT Glendale's products, in some cases under portions of GPT Glendale's or its predecessors' parts numbering system, without disclosing any limitations as to quantity, and while failing to stock such promoted GPT Glendale's products, and then instead offering buyers imitations of GPT Glendale's products made by other manufacturers, constitute false advertising of goods with an intent not to supply reasonable demand, all in violation of the common law of Rhode Island and other applicable law.

93. By engaging in these deceptive practices, Kentek willfully intends to trade on the reputation of GPT Glendale and has consciously disregarded the rights of GPT Glendale. In particular, Kentek has intentionally failed to take any reasonable precautions to prevent confusion and has acted with the intent to deceive purchasers and prospective purchasers.

94. Kentek's acts of unfair competition confuse and mislead the general public, such that customers are led to purchase Kentek's products when their actual intent was to buy GPT Glendale's products.

95. Kentek's acts of unfair competition deceive and injure purchasers and prospective purchasers. Such acts subvert GPT Glendale's control over the perception of the quality of its goods and its business reputation.

96. Kentek has willfully and knowingly engaged in the foregoing acts of unfair competition with the knowledge that they are deceptive. Kentek has derived unlawful gains and profits as a result of its unlawful acts.

97. As a result of Kentek's acts of unfair competition, Glendale has suffered and will continue to suffer irreparable harm to its business, to the goodwill associated with its business, and to its reputation.

98. Kentek's acts of unfair competition have caused and will continue to cause GPT Glendale damage in a yet to be ascertained amount.

99. If the aforesaid acts are permitted to continue, further loss, damage, and irreparable injury will be sustained by GPT Glendale, for which GPT Glendale has no adequate remedy at law.

100. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of common law unfair competition.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Kentek to cease its acts of unfair competition as described herein; (2) monetary damages, including, but not limited to, compensatory, special, and punitive damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

**COUNT III**
**TRADEMARK INFRINGEMENT**
**IN VIOLATION OF SECTION 32 OF THE LANHAM ACT**
**(Against Kentek)**

101. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 as if restated in full herein, and alleges further as follows:

102. Well after GPT Glendale acquired exclusive rights in its LASER-AID® Mark, Kentek began using and continued to use, until the latter part of June 2006, the mark LASEAID in connection with identical or closely related kinds of goods to those offered by GPT Glendale under its LASER-AID® Mark, namely, disposable laser eye shields. The goods offered by Kentek under the LASEAID mark were offered and provided to the same classes of purchasers through the same or similar channels of trade.

103. Kentek's use of the LASEAID mark for identical or related goods constituted a knowing and willful infringement of GPT Glendale's registered LASER-AID® Mark.

104. GPT Glendale's LASER-AID® Mark — as used by GPT Glendale for eye patches for medical use in the form of disposable laser eye shields — is very similar to the mark LASEAID used by Kentek for the same or closely related products. Indeed, the two marks are nearly identical in sound, spelling, and appearance. The mark used by Kentek so closely resembled GPT Glendale's LASER-AID® Mark as to be likely to cause confusion, mistake, or deception. This likelihood of confusion is heightened by the following facts:

a. disposable laser eye shields identified by the LASER-AID® Mark are sold only by GPT Glendale and its authorized distributors;

b. Kentek was, until recently, an authorized distributor of GPT Glendale products; and

c. since the April 14, 2006 effective date of its termination as an authorized distributor for GPT Glendale, Kentek continues to suggest that it remains an authorized distributor for GPT Glendale.

105. By engaging in the foregoing conduct, Kentek willfully and knowingly violated and infringed the rights of GPT Glendale in its federally registered LASER-AID® Mark, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Kentek did so with the intention of causing confusion, mistake, and deception and of wrongfully trading on the goodwill and reputation of GPT Glendale as represented and symbolized by its LASER-AID® Mark.

106. As a result of Kentek's trademark infringement in violation of the Lanham Act, GPT Glendale has suffered detriment to its business, goodwill, reputation, and profits, all to its damage in a yet to be ascertained amount. In addition, Kentek derived unlawful gains and profits as a result of its acts of infringement, and GPT Glendale has thereby been caused loss and damage. This is an exceptional case, and GPT Glendale is entitled to recover three times its damages or Kentek's profits plus reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it monetary damages, including, but not limited to, compensatory, special, and enhanced damages, and reasonable attorneys' fees and costs as may become applicable and as permitted by law, and all other relief that this Court deems just and proper.

## COUNT IV
## BREACH OF CONTRACT
## (Against Kentek)

107. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

108. Kentek and GPT Glendale entered into the Lase-R-Shield Confidentiality Agreement on November 22, 2002, in connection with the potential sale of Lase-R-Shield by GPT Glendale to Kentek.

109. Pursuant to the Lase-R-Shield Confidentiality Agreement, Kentek agreed to hold all Confidential Information, as defined by the agreement, received from GPT Glendale in strictest confidence for a period of five (5) years from the date of disclosure, not to divulge such information to any third party, and not to use such information for any purpose other that as agreed to by the parties.

110. Pursuant to the Lase-R-Shield Confidentiality Agreement, GPT Glendale provided Confidential Information, as defined by the agreement, to Kentek for the sole purpose of permitting Kentek to assess whether to purchase Lase-R-Shield from GPT Glendale.

111. Kentek breached the Lase-R-Shield Confidentiality Agreement by using the Confidential Information provided to it by GPT Glendale for business purposes other than assessing whether to purchase Lase-R-Shield, namely, to gain a competitive advantage over GPT Glendale.

112. As a direct and proximate result of Kentek's breach of the Lase-R-Shield Confidentiality Agreement, GPT Glendale has been and continues to be damaged in a yet to be ascertained amount.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it monetary damages, including reasonable attorneys' fees and costs as may become applicable and as permitted by law, and all other relief that this Court deems just and proper.

**COUNT V**
**BREACH OF CONTRACT**
**(Against Arthur)**

113. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

114. Arthur breached the Arthur Employment Agreement by:

a. competing with GPT Glendale, by and through his affiliation and/or employment with Kentek, in violation of Section 9(a) of the Arthur Employment Agreement;

b. disclosing Confidential Information, as defined in Section 6 of the Arthur Employment Agreement, to Kentek, in violation of Section 6 of the Arthur Employment Agreement; and

c. soliciting GPT Glendale employees, including Brown, to terminate their employment relationship with GPT Glendale and to accept an employment position with Kentek, in violation of Section 9(b) of the Arthur Employment Agreement.

115. As a direct and proximate result of Arthur's breach of the Arthur Employment Agreement, GPT Glendale has been and continues to be damaged in a yet to be ascertained amount.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it monetary damages, including reasonable attorneys' fees and costs as may become applicable and as permitted by law, and all other relief that this Court deems just and proper.

**COUNT VI**
**MISAPPROPRIATION OF TRADE SECRETS**
**(Against Kentek, Arthur, Simmons, and Pellegrini)**

116. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

117. Kentek has received from Arthur, Simmons, Pellegrini, Brown, and Carr (the "Former GPT Glendale Employees") confidential and proprietary information belonging to GPT Glendale, including GPT Glendale's formulas, methods, techniques, and processes (the "GPT Glendale Trade Secrets").

118. GPT Glendale derives actual and potential independent economic value from the GPT Glendale Trade Secrets not being generally known to, or readily ascertainable by proper means by, GPT Glendale's business competitors, including Kentek.

119. GPT Glendale takes measures that are reasonable under the circumstances to maintain the secrecy of the GPT Glendale Trade Secrets, including instituting employee policies regarding the protection of confidential information, the use of confidentiality agreements with certain employees, the disclosure of confidential information within the company on only a "need to know basis," and the storage of certain materials — in both hard copy and electronic form — in secure areas.

120. The GPT Glendale Trade Secrets are protectable trade secrets under Rhode Island's Uniform Trade Secrets Act, R.I. Gen. Law § 6-41-1(4) or under other applicable law.

121. The GPT Glendale Trade Secrets were acquired by the Former GPT Glendale Employees by improper means, including the breach of a duty held by each of the Former GPT Glendale Employees to maintain the secrecy of the GPT Glendale Trade Secrets. This duty arose by virtue of Rhode Island's recognition of an employee's common law duty of loyalty to his or her employer. This duty further arose out of the Former GPT Glendale Employees' terms and

conditions of employment with GPT Glendale. These terms and conditions include the Statement of Ethical Values and Code of Business Conduct (the "GPT Glendale Code") acknowledged by each of the Former GPT Glendale Employees. A true and correct copy of the GPT Glendale Code is attached hereto as **Exhibit I**.

122. Kentek knew or had reason to know that the Former GPT Glendale Employees owed GPT Glendale a duty to maintain the secrecy of the GPT Glendale Trade Secrets.

123. Kentek willfully and without legal justification has used the GPT Glendale Trade Secrets without GPT Glendale's express or implied consent.

124. Kentek is obtaining economic value from its possession and use of the GPT Glendale's trade secrets.

125. If the aforesaid acts are permitted to continue, further loss, damage, and irreparable injury will be sustained by GPT Glendale, for which GPT Glendale has no adequate remedy at law.

126. The aforesaid acts have caused and continue to cause GPT Glendale damage in a yet to be ascertained amount .

127. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of misappropriation of trade secrets against Kentek, Arthur, Simmons, and Pellegrini.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Kentek, Arthur, Simmons, and Pellegrini to cease violating the Rhode Island Uniform Trade Secrets Act or other applicable law as described herein; (2) monetary damages, including compensatory, special, and punitive damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(Against Arthur)**

128. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

129. Arthur owed GPT Glendale a fiduciary duty not to compete with GPT Glendale during his employment with GPT Glendale and while continuing on GPT Glendale's payroll pursuant to the Non-Competition provision of the Arthur Employment Agreement.

130. Arthur breached his fiduciary duty to GPT Glendale by engaging in competitive activities to the benefit of Kentek and to the detriment of GPT Glendale while continuing to receive a paycheck from GPT Glendale. These competitive activities include:

a. failing to update GPT Glendale's customer database with information about current and prospective customers of GPT Glendale;

b. referring customers to Kentek while still a sales agent for GPT Glendale; and

c. acting for the benefit of, or engaging in business relations with, Kentek while still employed with GPT Glendale and while still on the GPT Glendale payroll pursuant to the terms of the Non-Competition provision in the Arthur Employment Agreement.

131. GPT Glendale has already suffered and will continue to suffer irreparable injury and monetary damages in a yet to be ascertained amount from Arthur's breach of fiduciary duty owed to GPT Glendale.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it monetary damages, including reasonable attorneys' fees and costs as may become applicable and as permitted by law, and all other relief that the court deems just and proper.

**COUNT VIII**
**BREACH OF DUTY OF LOYALTY**
**(Against Arthur, Simmons, and Pellegrini)**

132. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

133. As an employee for GPT Glendale, Arthur had access to confidential and proprietary business information, including GPT Glendale's customer lists and knowledge about GPT Glendale customers' specific needs that could not be obtained through public channels. This information is confidential and proprietary to GPT Glendale.

134. Before leaving his employment with GPT Glendale, Arthur began to usurp GPT Glendale's business opportunities for the benefit of Kentek and to share GPT Glendale's confidential and proprietary information with Kentek. Arthur has continued sharing GPT Glendale's confidential and proprietary information with Kentek despite the fact that he remains on GPT Glendale's payroll pursuant to the Non-Competition Provision of the Arthur Employment Agreement.

135. As an employee for GPT Glendale, Simmons had access to GPT Glendale's sources of supply, and the formulas, bills of materials, and product history for each of the various dyes used to make GPT Glendale's products. This information is confidential and proprietary to GPT Glendale. After leaving the employ of GPT Glendale, Simmons began working for Kentek. At that time, she brought with her to, and began sharing with, Kentek confidential and proprietary GPT Glendale information.

136. As an employee for GPT Glendale, Pellegrini had access to the identity of key vendors, the proprietary process by which GPT Glendale manufactures laser eyewear, and how various aspects of the process are brought together to manufacture products for distribution. This information is confidential and proprietary to GPT Glendale. After leaving the employ of

GPT Glendale, Pellegrini began working for Kentek, and brought with him to, and began sharing with, Kentek confidential and proprietary GPT Glendale information.

137. Both during and after the respective terms of their employment with GPT Glendale, Arthur, Simmons, and Pellegrini each owed GPT Glendale a duty of loyalty, including a duty not to breach GPT Glendale's confidence in a manner beneficial to a direct competitor.

138. Arthur, Simmons, and Pellegrini have each breached their duty of loyalty to GPT Glendale by disclosing GPT Glendale confidential and proprietary information to Kentek.

139. GPT Glendale has already suffered and will continue to suffer irreparable injury and monetary damages in a yet to be ascertained amount from Arthur, Simmons, and Pellegrini's respective breaches of loyalty owed to GPT Glendale.

140. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of breach of duty of loyalty against Arthur, Simmons, and Pellegrini.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Arthur, Simmons, and Pellegrini to cease their disclosure of confidential and proprietary GPT Glendale information to Kentek in breach of their duty of loyalty to GPT Glendale; (2) monetary damages, including compensatory, special, and punitive damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

## COUNT IX
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
## (Against Kentek)

141. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

142. Arthur remains subject to the Arthur Employment Agreement's Non-Competition Provision, by which Arthur remains an employee of GPT Glendale through December 31, 2006, receiving full pay and benefits until that date. Under the terms of the Non-Competition Provision, Arthur is prohibited from engaging in any activity competitive with that of GPT Glendale until January 1, 2007.

143. Kentek is aware of the Arthur Employment Agreement, including its Non-Competition Provision.

144. Despite this knowledge, Kentek has intentionally engaged Arthur in activity competitive with that of GPT Glendale.

145. Kentek's engagement of Arthur in violation of the terms of the Arthur Employment Agreement's Non-Competition Provision, while Arthur continues to receive compensation from GPT Glendale, has damaged and continues to damage GPT Glendale and threatens GPT Glendale with additional irreparable injury.

146. Kentek is also aware that GPT Glendale has contractual and business relationships with companies that purchase and/or distribute GPT Glendale products (the "GPT Glendale Customers").

147. Kentek has intentionally interfered with GPT Glendale's business relationships by advising the GPT Glendale Customers not to purchase GPT Glendale products because Kentek will soon be coming out with "knock-off" products purportedly identical to and cheaper than those offered by GPT Glendale.

148. Kentek has also intentionally interfered with GPT Glendale's business relationships by providing the GPT Glendale Customers with false information regarding the availability of GPT Glendale's products.

149. GPT Glendale has already suffered and will continue to suffer irreparable injury and monetary damages in a yet to be ascertained amount from Kentek's interference with GPT Glendale's contractual relationships.

150. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of tortious interference with business relationships against Kentek.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Kentek to cease its interference in GPT Glendale's business relationships; (2) monetary damages, including compensatory, special, and punitive damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

## COUNT X
## INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONSHIPS
## (Against Kentek)

151. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

152. Because of its former status as an authorized distributor of GPT Glendale products, and further because of its continuing efforts to hold itself out as an authorized distributor of GPT Glendale products, Kentek is contacted regularly by potential customers seeking to purchase GPT Glendale products.

153. Kentek has intentionally interfered with GPT Glendale's prospective contractual relationships by failing to advise these potential customers that Kentek is no longer an authorized distributor of GPT Glendale. Rather, Kentek has advised these potential customers not to purchase GPT Glendale products because Kentek has alternative eyewear and because Kentek

will soon be coming out with "knock-off" eye patch products purportedly identical to and cheaper than those offered by GPT Glendale.

154. Kentek has further intentionally interfered with GPT Glendale's prospective contractual relationships by falsely informing potential customers seeking to purchase GPT Glendale products that the GPT Glendale products will not be available for six to nine weeks, leading the potential customers to purchase instead alternative products manufactured by Kentek.

155. GPT Glendale has already suffered and will continue to suffer irreparable injury and monetary damages in a yet to be ascertained amount from Kentek's actions interference with GPT Glendale's prospective contractual relationships.

156. GPT Glendale has a reasonable belief that it will succeed on the merits of its claim of interference with prospective contractual relationships against Kentek.

**WHEREFORE**, GPT Glendale respectfully requests that this Court award it injunctive and declaratory relief, damages, and other relief as follows: (1) a preliminary and permanent injunction requiring Kentek to cease its interference in GPT Glendale's prospective contractual relationships; (2) monetary damages, including compensatory, special, and punitive damages; and (3) reasonable attorneys' fees and costs as may become applicable and as permitted by law.

**COUNT XI**
**PATENT INFRINGEMENT**
**(Against Kentek)**

157. GPT Glendale re-alleges and incorporates by reference paragraphs 1 through 74 of this Complaint, and alleges further as follows:

158. U.S. Patent No. 6,320,094 (the "'094 Patent"), titled "Disposable Eye Patch And Method Of Manufacturing A Disposable Eye Patch," was issued to Nancy L. Arnold and Jeffrey

M. Stein on November 20, 2001. A true and correct copy of the '094 Patent is attached hereto as **Exhibit J**.

159. The '094 Patent relates generally to a disposable eye covering, in the form of a "patch" or "shield," which has applications in surgical and/or professional facial care procedures.

160. The '094 Patent was assigned to GPT Glendale, Inc. on or about September 15, 2000. Documents evidencing the assignment were recorded in the records of the PTO at Reel 11100, Frame 0416, with a recordation date of September 15, 2000.

161. GPT Glendale has been, at all times relevant to this action, and is still the owner of the '094 Patent.

162. GPT Glendale makes and sells disposable eye shields which are covered by one or more claims of the '094 Patent.

163. The Kentek SEPS-EyeSafe product infringes one or more claims of the '094 Patent.

164. Kentek has sold, offered to sell, imported, and/or used in this judicial district and elsewhere in the United States, articles that directly, contributorily, or by inducement, infringe one or more of the claims of the '094 Patent.

165. GPT Glendale has received reports that Kentek has pre-sold approximately 500 boxes of its infringing product, each box containing approximately 50 or 100 individual items of infringing merchandise.

166. Kentek has, by its advertising, product instruction, import, and/or sale of eye shield articles in the United States, induced infringement of one or more of the claims of the '094 Patent.

167. The infringement by Kentek of the '094 Patent has injured GPT Glendale and will cause GPT Glendale irreparable injury and damage in the future unless Kentek is enjoined from infringing the '094 Patent.

168. Kentek has willfully, deliberately, and intentionally infringed the claims of the '094 Patent.

**WHEREFORE,** GPT Glendale respectfully requests judgment against Kentek as follows: (1) that Kentek has infringed the '094 Patent; (2) that Kentek and its respective agents, servants, officers, directors, employees, and all persons acting in concert with them, directly or indirectly, be temporarily and permanently enjoined from infringing, inducing others to infringe, or contributing to the infringement of the '094 Patent; (3) that Kentek be ordered to account for and pay to GPT Glendale damages adequate to compensate for Kentek's infringement of the '094 Patent; (4) that a post-judgment equitable accounting of damages be ordered for the period of infringement of the '094 Patent following the period of damages established by GPT Glendale at trial; (5) that damages be trebled for the willful, deliberate, and intentional infringement by Kentek as alleged herein in accordance with 35 U.S.C. § 284; (6) that this case be adjudged an exceptional case under 35 U.S.C. § 285 and that GPT Glendale be awarded its costs, expenses, and disbursements incurred in this action, including reasonable attorneys' fees as available by law to be paid by Kentek; (7) for an award of pre-judgment interest, post-judgment interest and costs in this action; and (8) for such other relief to GPT Glendale as this Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

GPT Glendale respectfully requests a trial by jury of the issues raised in this Complaint.

Dated: July 21, 2006

Respectfully submitted,

**GPT GLENDALE, INC.**

By: /s/ Darlene K. Alt

Darlene K. Alt (Rhode Island Bar No. 6345)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 (fax)

Michael J. Lockerby
Peter G. Mack
Mark A. Salzberg
FOLEY & LARDNER LLP
3000 K Street NW, Suite 500
Washington, DC 20007
(202) 672-5300
(202) 672-5399 (fax)

*Of counsel for GPT Glendale, Inc.*

**VERIFICATION**

I, Mark McLear, declare under penalty of perjury that I am the Laser Sales and Marketing Manager of GPT Glendale, Inc., that I have read the foregoing Complaint and that the contents and the allegations set forth in the Complaint are true and correct of my own personal knowledge, except as to matters stated on information and belief, and, as to such matters, they are true and correct to the best of my knowledge, information and belief.

Executed on July 20, 2006,in Smithfield,
Rhode Island

Mark McLear
Laser Sales and Marketing Manager
GPT Glendale, Inc.