UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GPT GLENDALE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>KENTEK CORPORATION, a New Hampshire corporation;<br><br>WILLIAM L. ARTHUR, an individual resident of New Mexico;<br><br>BONNIE G. SIMMONS, an individual resident of New Hampshire;<br><br>RICHARD L. PELLEGRINI, an individual resident of Florida,<br><br>Defendants. | ) | C.A. No. 06-334-ML |

**GPT GLENDALE'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Plaintiff, GPT Glendale, Inc. ("GPT Glendale"), by counsel, respectfully states as follows in opposition to the motion to dismiss GPT Glendale's Complaint for alleged lack of personal jurisdiction filed by Defendants Kentek Corporation ("Kentek"), Bonnie G. Simmons ("Simmons"), and Richard L. Pellegrini ("Pellegrini" and, collectively with Kentek and Simmons, "Defendants"). GPT Glendale hereby incorporates by reference the accompanying Affidavit of Mark McLear ("McLear Affidavit," cited as "McLear Aff.").

## I. PRELIMINARY STATEMENT

By its own admission, Kentek was, until recently, engaged in a business relationship with GPT Glendale — a relationship that lasted for nearly ten years. From 1997 through the Spring of

2006, Kentek sent orders to and from Rhode Island, received shipments of products from Rhode Island, made payments in Rhode Island, and otherwise transacted business with GPT Glendale in Rhode Island. (McLear Aff. ¶¶ 8–11.) By entering into this relationship, and by acting as an authorized distributor for GPT Glendale for nearly ten years, Kentek subjected itself to the jurisdiction of Rhode Island courts. The unfair competition, misappropriation of trade secrets, tortious interference, and other wrongful conduct of which GPT Glendale complains, moreover, were all directed at GPT Glendale in Rhode Island. As a result of Defendants' conduct, GPT Glendale has suffered injury in Rhode Island. Under the circumstances, Defendants certainly could and should have foreseen that they might be subject to suit in Rhode Island.

Notwithstanding these facts, Defendants would have this Court believe that it would somehow offend due process for them to have to answer for their wrongs in Rhode Island — a state in which ***all of them*** have transacted business, ***all of them*** have misappropriated GPT Glendale's trade secrets, and ***all of them*** have otherwise caused competitive injury to GPT Glendale. Kentek seeks dismissal merely because it is not registered to do business in Rhode Island; has no offices, property, agents, employees, or sales force in Rhode Island; does not advertise in Rhode Island; and has made "only" around twenty sales of certain of its products to Rhode Island customers in the past two and a half years. (Affidavit of Thomas D. MacMullin ("MacMullin Aff.") ¶¶ 2–7.) The arm of Rhode Island law, however, is longer than Kentek would have this Court believe. The "minimum contacts" test required to satisfy due process has never been interpreted as requiring a physical presence in the forum to subject a defendant to personal jurisdiction.

Simmons and Pellegrini, for their part, seek dismissal of GPT Glendale's claims simply because, after working for GPT Glendale in Rhode Island — each for more than three years[1] — they no longer live or work in Rhode Island. (Affidavit of Bonnie G. Simmons ("Simmons Aff.") ¶¶ 2–3; Affidavit of Richard L. Pellegrini ("Pellegrini Aff.") ¶¶ 4, 6–7.) Not surprisingly, Simmons and Pellegrini cite no authority for the proposition that they can avoid having to answer for wrongs directed toward a Rhode Island resident merely by moving across state lines. In short, Defendants' motion to dismiss is totally devoid of merit and ought to be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. GPT Glendale Has Its Principal Place of Business in Rhode Island and Manufactures Protective Eyewear and Specialty Filters in Rhode Island.

GPT Glendale has its principal place of business in Smithfield, Rhode Island. (Compl. ¶ 6.) GPT Glendale also operates its manufacturing facility in Smithfield, Rhode Island. (Compl. ¶ 16.) At this facility, GPT Glendale manufactures its well-known, high quality protective eyewear and specialty filters for sale to medical laser manufacturers, doctors, hospitals, surgery centers, spas, and industrial distributors in markets throughout the United States and the world. (Compl. ¶ 17.) GPT Glendale sells its products directly to laser equipment manufacturers, and relies on a network of loyal authorized distributors for sales in other market channels. (Compl. ¶ 18.) Aside from the direct sales, GPT Glendale products are sold only through authorized distributors. (Compl. ¶ 49.) Among these authorized distributors is GPT Glendale's own distribution division, Lase-R-Shield. (Compl. ¶ 19.)

[1] Simmons worked at GPT Glendale's Smithfield, Rhode Island, office from November 2001 through July 2005. Pellegrini worked for GPT Glendale for more than six years, including three years — from September 2001 through October 2004 — at GPT Glendale's Smithfield, Rhode Island office.

**B. As an Authorized GPT Glendale Distributor for Nine Years, Kentek Routinely Did Business in Rhode Island.**

From 1997 until April 14, 2006, Kentek was one of GPT Glendale's authorized distributors. (Compl. ¶¶ 20, 47.) While the parties' distributorship relationship was not memorialized in a written distributor agreement (Compl. ¶ 20), their course of conduct over nearly ten years evidences the business ties between the two companies (Compl. ¶¶ 20–21). For at least five years before termination of this relationship, Kentek was GPT Glendale's largest outside distributor for GPT Glendale products. (Compl. ¶ 21.) In 2005, Kentek accounted for approximately $742,000.00 in GPT Glendale's sales. (McLear Aff. ¶ 16.) The relationship was important for Kentek as well. In 2005, for example, sales of GPT Glendale products amounted to approximately 20 percent of Kentek's $6 million total sales. (*Id*.)

In 2002, Kentek approached GPT Glendale to propose a purchase of Lase-R-Shield from GPT Glendale. (Compl. ¶ 22.) At the time, Kentek and Lase-R-Shield were direct competitors for the distribution of laser protective eyewear products. (Compl. ¶ 21.) Kentek professed an interest in undertaking due diligence regarding a potential purchase of GPT Glendale's Lase-R-Shield business unit. The parties thus entered into the November 22, 2002 Mutual Confidentiality Agreement (the "Lase-R-Shield Confidentiality Agreement") to govern Kentek's access to GPT Glendale's confidential information during these negotiations. (Compl. ¶ 22.) By signing the Lase-R-Shield Confidentiality Agreement, Kentek agreed to hold all confidential information — as defined by the agreement — received from GPT Glendale in strictest confidence for a period of five years from the date of disclosure, not to divulge such information to any third party, and not to use such information for any purpose other than as agreed to by the parties. (Compl. ¶ 23.)

Negotiations surrounding the sale of Lase-R-Shield continued on and off for approximately two years. (Compl. ¶ 24; McLear Aff. ¶ 12.) These negotiations took place in

both Rhode Island and New Hampshire, and resulted in the exchange of confidential and proprietary business information — including a detailed overview of the Lase-R-Shield business and its customers — flowing between the two corporations in Rhode Island and New Hampshire. (McLear Aff. ¶ 13; MacMullin Aff. ¶ 9; Compl. ¶ 24.) GPT Glendale provided Kentek with this confidential and proprietary information for the sole purpose of allowing Kentek to evaluate the potential purchase of Lase-R-Shield. (Compl. ¶ 24.) In 2004, however, Kentek informed GPT Glendale that it was no longer interested in purchasing Lase-R-Shield and broke off all negotiations. (Compl. ¶ 25.)

### C. Kentek Has Engaged in Unfair Competition to Enter the Market As a Manufacturer and Distributor of Laser Eyewear Products.

Without GPT Glendale's knowledge, both during and after the negotiations for the sale of Lase-R-Shield, Kentek was in the process of developing its own laser protective eyewear manufacturing and distribution company. (Compl. ¶ 26.) Since terminating the Lase-R-Shield negotiations, Kentek has engaged in countless acts of unfair competition designed to build its own manufacturing and distribution business to the detriment of GPT Glendale. (Compl. ¶ 26, *et seq*.) As a result of Kentek's unfair and harmful practices, GPT Glendale terminated Kentek as an authorized distributor of GPT Glendale products by letter dated April 11, 2006, with termination effective April 14, 2006. (Compl. ¶ 47.) Kentek's wrongful acts directed toward GPT Glendale in Rhode Island have only continued since then. (*See, e.g.*, Compl. ¶¶ 27–28, 49, 52, 54, 56, 68, 72–73.) Kentek's harmful and tortious business practices are described in turn below.

#### 1. Kentek has used trade secrets pursuant to the Lase-R-Shield Confidentiality Agreement to the detriment of GPT Glendale.

Kentek has used the trade secrets provided to it by GPT Glendale under the Lase-R-Shield Confidentiality Agreement to build its distribution business and obtain customers.

(Compl. ¶¶ 24, 26.) Kentek's breach of the Lase-R-Shield Confidentiality Agreement has caused and — unless enjoined — will continue to cause GPT Glendale to suffer harm in Rhode Island. (Compl. ¶ 24.)

### 2. **<u>Kentek has misappropriated GPT Glendale's trade secrets by hiring current and former GPT Glendale employees</u>.**

Kentek has also actively sought to hire or hire away from GPT Glendale former and current members of GPT Glendale's senior management and other employees with the goal of gaining a competitive advantage over GPT Glendale. (Compl. ¶ 27.) Kentek has succeeded in hiring at least five former GPT Glendale employees, including the entire competing Lase-R-Shield sales unit. (*Id.*) Among the former GPT Glendale employees currently working for Kentek are Simmons and Pellegrini. (*Id.*; Simmons Aff. ¶ 1; Pellegrini Aff. ¶ 6; MacMullin Aff. ¶¶ 13, 16.)

Simmons had worked for GPT Glendale for three years at its Smithfield, Rhode Island office, from approximately November 2001 though July 2005, and lived in Rhode Island continuously during this time. (McLear Aff. ¶ 14; Simmons Aff. ¶ 2.) As a Materials Specialist for GPT Glendale, Simmons was responsible for coordinating the planning for the production of GPT Glendale's products. (Compl. ¶¶ 41–42.) In this position, Simmons had access to GPT Glendale's sources of supply, and the formulas, bills of material, and product history for each of the various dyes used to manufacture GPT Glendale's products — all protectable GPT Glendale trade secrets. (Compl. ¶ 42.) Simmons also had access to contact information for GPT Glendale's suppliers of the ingredients for the dyes. (*Id.*) Simmons now works in the same capacity for Kentek in New Hampshire, where she undoubtedly has used or inevitably must make use of GPT Glendale's confidential and propriety information to the benefit of Kentek and detriment of GPT Glendale. (Compl. ¶¶ 43–44; Simmons Aff. ¶ 3; McLear Aff. ¶ 14; MacMullin Aff. ¶ 16.) GPT Glendale has direct evidence of misuse by Simmons of GPT

Glendale's trade secrets since beginning her employment with Kentek. For example, Simmons contacted one of GPT Glendale's vendors of a metal eye cap product to request that it manufacture an identical product for Kentek. (Compl. ¶ 44.)

Pellegrini was formerly a Vice President for GPT Glendale, where he worked for more than six years. (McLear Aff. ¶ 15; Pellegrini Aff. ¶ 5; MacMullin Aff. ¶ 13.) For the last three of Pellegrini's years of employment with GPT Glendale, from September 2001 through October 2004, he worked in GPT Glendale's Smithfield, Rhode Island office. During this time, Pellegrini also lived in Rhode Island. (McLear Aff. ¶ 15.) Through his employment with GPT Glendale, Pellegrini had access to various trade secrets of GPT Glendale. These include the identities of key vendors, the proprietary process by which GPT Glendale manufactures laser eyewear, and how various aspects of the process are brought together to manufacture products for distribution. (Compl. ¶ 45.) Pellegrini currently acts as a consultant regarding these same areas for Kentek, and undoubtedly has disclosed or inevitably must disclose this confidential and proprietary information in the course of performing his services for Kentek. (Compl. ¶ 117, MacMullin Aff. ¶ 13; Pellegrini Aff. ¶ 6; McLear Aff. ¶ 15.)

**3. Kentek has misused GPT Glendale's registered trademarks and photographs of GPT Glendale products in its advertising materials.**

Despite the termination of Kentek as an authorized distributor of GPT Glendale products, Kentek continued to advertise GPT Glendale products on its website, and only recently began to de-identify itself from GPT Glendale. (Compl. ¶ 50.) Until very recently, the majority of products displayed on Kentek's website were advertised using photographs of GPT Glendale products — implying to customers a continuing relationship with GPT Glendale in Rhode Island. (Compl. ¶¶ 49–50, 68–74.) At least one of these products made improper use of one of GPT Glendale's registered trademarks. (Compl. ¶ 72.) Kentek also employs a product numbering



PRV_838285_1

system sufficiently similar to GPT Glendale's own proprietary numbering system as to cause customers confusion as to Kentek's affiliation with GPT Glendale. (Compl. ¶¶ 76, 87.)

Kentek's website is interactive, and available globally — including, of course, to citizens of Rhode Island. (MacMullin Aff. ¶ 3.) Customers can order products directly from Kentek's website — or obtain Kentek's contact information for ordering products in some other manner or obtaining further information. (*Id.*; *see also* http://www.kenteklaserstore.com.) Kentek itself admits that Rhode Island residents access its website and order its products. (MacMullin Aff. ¶¶ 3–7.)

In addition to the acts of unfair competition visible on Kentek's website, Kentek has also misinformed current and potential GPT Glendale customers about the availability of GPT Glendale products. Kentek's misinformation includes false statements to customers that certain GPT Glendale products are not currently available or are no longer being manufactured. (Compl. ¶¶ 56, 59.) These misrepresentations were made without providing the customer the material information that Kentek was no longer an authorized distributor of GPT Glendale — purposefully suggesting a continuing relationship with GPT Glendale in Rhode Island that inures to Kentek's economic benefit and harms GPT Glendale. (Compl. ¶¶ 57–60.)

In short, Kentek has sought to "poach" on GPT Glendale's reputation, intellectual property, and established business model and practices to enter the laser eyewear market with an immediate unfair competitive advantage. By their actionsdirected at GPT Glendale in Rhode Island, Kentek, Simmons, and Pellegrini have intentionally harmed GPT Glendale in Rhode Island. Defendants will undoubtedly continue to do so if not enjoined by this Court.

## III. PROCEDURAL STANDARD

### A. Rule 12(b)(2) Requires This Court to Resolve All Disputed Facts and Draw All Reasonable Inferences in Favor of GPT Glendale.

In deciding Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), this Court may rely upon the allegations in GPT Glendale's Verified Complaint and the accompanying McLear Affidavit. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 45 (1st Cir. 2002). As the plaintiff, GPT Glendale has the burden of proving the Court's personal jurisdiction over the defendants. *Id.* at 50. But until and unless this Court holds an evidentiary hearing, GPT Glendale need merely establish a *prima facie* case of personal jurisdiction. *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 987 F.2d 39, 43 (1st Cir. 1993); *see also Nowak v. Tak How Inv., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996) (where facts are undisputed, "the *prima facie* standard is both appropriate and preferred").

Under these circumstances, the Court must construe all relevant pleading allegations in the light most favorable to GPT Glendale, assume the credibility of GPT Glendale's allegations, and draw the most favorable inferences for the existence of jurisdiction. *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 24 (1st Cir. 2005); *Women & Infants Hosp. of R.I. v. Cmty. Health Network of Conn., Inc.*, 394 F. Supp. 2d 488, 491 (D.R.I. 2005). First Circuit precedents also require this Court resolve all factual disputes in favor of GPT Glendale and make all reasonable inferences in favor of GPT Glendale. *Northern Laminate Sales*, 403 F.3d at 24 ("We take [plaintiff's] facts as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim.").

**B. Due Process Requires Relatedness and Purposeful Availment and That This Court's Exercise of Jurisdiction Over Defendants Be Reasonable.**

This Court may exercise personal jurisdiction over Kentek, Simmons, and Pellegrini if (1) jurisdiction is authorized under Rhode Island's long-arm statute; and (2) the assertion of jurisdiction comports with Fourteenth Amendment due process requirements. *Northern Laminate Sales*, 403 F.3d at 24. Rhode Island's long-arm statute authorizes assertion of personal jurisdiction to the fullest extent permitted by the United States Constitution. R.I. Gen. Laws § 9-5-33. Thus, this Court need only examine the second prong of the jurisdictional analysis, *i.e.*, due process. *Northeastern Land Serv., Ltd. v. Schulke*, 988 F. Supp. 54, 57 (D.R.I. 1997).

Due process requires that "minimum contacts" exist between Defendants and the State of Rhode Island such that maintenance of this action does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The First Circuit divides the due process analysis into three inquiries: relatedness, purposeful availment, and reasonableness.[2] *Northern Laminate Sales*, 403 F.3d at 25. Taken together, the first two — relatedness and purposeful availment — make up the "minimum contacts" aspect of the due process analysis. *Nowak*, 94 F.3d at 713 (the relatedness test is one aspect of demonstrating minimum contacts; the other focuses on the deliberateness of the defendants' contacts, or purposeful availment).

[2] When a defendant lacks continuous and systematic contacts with the forum state that would support the exercise of general jurisdiction, a court may still exercise specific jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state. In this case, Defendants' contacts with Rhode Island were arguably sufficient to establish general jurisdiction. This analysis, however, focuses on whether they are subject to specific jurisdiction based on their contacts with Rhode Island.

# IV. ARGUMENT

## A. Kentek, Simmons, and Pellegrini Purposefully Directed Their Activities Toward Rhode Island, and This Litigation Relates to Those Activities.

The connection between Defendants and Rhode Island necessary for a finding of "minimum contacts" must result from actions that Defendants directed toward this state. *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987). Those actions must have been both voluntary and have made it reasonably foreseeable that Defendants would be haled into this state's courts. *Northeastern Land*, 988 F. Supp. at 58.

To be subject to personal jurisdiction in Rhode Island, Defendants need not have a physical presence here. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (jurisdiction cannot be avoided "merely because the defendant did not physically enter the forum state"); *see also Northern Laminate Sales*, 403 F.3d at 25 (defendant need not be physically present in the forum state to cause injury — and thus activity — in that state). Even a single contact can be sufficient to create jurisdiction so long as that contact is meaningful. *Nowak*, 94 F.3d at 717 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Each of the Defendants in this action, however, has far more than a single contact with Rhode Island.

First, Kentek was substantially connected with Rhode Island by virtue of its longstanding business relationship with GPT Glendale as an authorized distributor of GPT Glendale products. GPT Glendale's breach of contract claim is not based upon its distributorship agreement with Kentek. That agreement, however, is still highly relevant to the minimum contacts analysis. Reaching out beyond one state and creating continuing relationships with and obligations to citizens of another state subjects one to the jurisdiction of the other state for the consequences of one's actions. *Northeastern Land*, 988 F. Supp. at 58 (citing *Burger King*, 471 U.S. at 473). By voluntarily contracting with GPT Glendale to become an authorized distributor, Kentek reached beyond its own state to form a continuing relationship with and create obligations to GPT

Glendale. The distributorship agreement formed the basis of a working relationship between GPT Glendale and Kentek that both contemplated and resulted in ongoing interaction between GPT Glendale in Rhode Island and Kentek in New Hampshire. That voluntary arrangement benefited Kentek economically and made it foreseeable that Kentek could be brought to court in Rhode Island should any disputes arise between it and GPT Glendale.[3] *See, e.g.*, *Daynard*, 290 F.3d at 61-62.

Likewise, both Simmons and Pellegrini voluntarily accepted employment with GPT Glendale, and both worked for the company in Rhode Island for more than three years. Like Kentek, they both benefited economically from their arrangement with GPT Glendale. They both certainly should have foreseen their own amenability to suit in Rhode Island for any injurious actions they directed toward GPT Glendale.

It is against this backdrop that GPT Glendale's claims against Kentek, Simmons, and Pellegrini arise.

**1. GPT Glendale's breach of contract claims arise from Kentek's actions directed toward Rhode Island.**

The Lase-R-Shield Confidentiality Agreement arose directly out of Kentek's contacts with GPT Glendale and, consequently, Rhode Island. That the Lase-R-Shield Confidentiality Agreement was not executed in Rhode Island is not critical to the Court's jurisdiction. *Scott Brass, Inc. v. Wire & Metal Specialties Corp.*, 344 F. Supp. 711, 717 (D.R.I. 1972) (final execution of contract in forum state not necessary to find defendant has sufficient minimum contacts with the state). Nor is it dispositive that the contract is governed by the laws of Massachusetts rather than that of Rhode Island. Indeed, where the creation of a commercial

[3] Were the tables turned, surely Kentek could have looked to Rhode Island courts to enforce its underlying contractual relationship with GPT Glendale if it believed GPT Glendale had failed to meet any of its contractual obligations. *See, e.g., Dynamic Concepts, Inc. v. Modern Chain Mfg. Co.*, 610 F. Supp. 285, 298 n.13 (D.R.I. 1985).

relationship itself evidences a substantial connection — as is the case here — courts do not require a finding that the parties' contract expressly specify that the law of the forum state applies. *See Dynamic Concepts, Inc. v. Modern Chain Mfg. Co.*, 610 F. Supp. 285, 289 (D.R.I. 1985). Rather, courts look also to the parties' prior negotiations, the terms of the contract itself, and the actual and contemplated course of dealings between the parties. *Id.* at 288.

The Lase-R-Shield Confidentiality Agreement evidences a substantial connection between Kentek and Rhode Island. First, it was Kentek that approached GPT Glendale about the potential purchase of Lase-R-Shield. The Lase-R-Shield Confidentiality Agreement that resulted contemplated ongoing interaction between Kentek and GPT Glendale in negotiating the possible sale of GPT Glendale's distribution arm, Lase-R-Shield. Part of that interaction was the exchange of confidential information between GPT Glendale in Rhode Island and Kentek in New Hampshire during a protracted period in which Kentek was purportedly engaged in due diligence. Negotiations between the two companies continued for two years. These negotiations required multiple phone calls, e-mails, and shipments of documents and materials to and from Rhode Island, as well as in-person meetings — at least one of which occurred in Rhode Island. (MacMullin Aff. ¶ 9; McLear Aff. ¶ 13.) Moreover, it was foreseeable that Kentek's breach of this agreement would cause harm in Rhode Island to a resident of Rhode Island, GPT Glendale.

Given the nature and purpose of the Lase-R-Shield Confidentiality Agreement — combined with Kentek's physical presence in Rhode Island during its negotiation and performance, and the ongoing relationship between Kentek and GPT Glendale surrounding the potential sale of Lase-R-Shield — this Court should easily find that Kentek engaged in "purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable." *Daynard*, 290 F.3d at 62 (citing *Rush v. Savchuk*, 444 U.S. 320, 329 (1980)). Under controlling Supreme Court, First Circuit, and other precedents, it is not dispositive that the

Lase-R-Shield Confidentiality Agreement was not executed in Rhode Island and did not require resolution of disputes under Rhode Island law. The foregoing facts establish that the contract nonetheless "had substantial connection with the state" sufficient to support personal jurisdiction. *See Daynard*, 290 F.3d at 61-62 (oral contract initiated by defendants while present in forum state or by phone or mail from another state combined with partial performance of contract in forum state deemed sufficient contacts for plaintiff's breach of contract claim).

**2. <u>By committing torts directed at GPT Glendale in Rhode Island, Defendants had fair warning that they could be sued there</u>.**

Unlike breach of contract claims, tort claims are not subject to the "purposeful availment" standard. *Thompson Trading Ltd. v. Allied Lyons PLC*, 123 F.R.D. 417, 426 (D.R.I. 1989) ("one committing a tort in a forum does not purposefully avail himself of the benefits and protections of its laws, since such laws are not supporting and protecting his illegal activities"). Rather, for tort claims, this Court must focus on the causal nexus between Defendants' contacts with Rhode Island and the harm alleged in GPT Glendale's complaint. *See Northeastern Land*, 988 F. Supp. at 57-58. Due process requires only that Defendants have "fair warning" that their activities may make them amenable to suit in the forum state. *Id*. at 59. The fair warning requirement is met if Defendants have "purposefully directed [their] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those injuries." *Burger King*, 471 U.S. at 472. Indeed, the First Circuit has held that where a defendant's out-of-forum actions intentionally cause tortious injury in the forum, jurisdiction will obtain for any claims arising from that injury. *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989); *Northeastern Land*, 988 F. Supp. at 59.

**a. Because Kentek knew that its conduct would harm GPT Glendale in Rhode Island, Kentek had "fair warning."**

Kentek's actions directed at GPT Glendale in Rhode Island meet the "fair warning" requirement. First, there is undeniably a causal nexus between Kentek's actions — including entering into and then breaching the Lase-R-Shield Confidentiality Agreement, providing false information to actual and potential GPT Glendale customers, displaying photographs of GPT Glendale products on its website to advertise Kentek knock-off products, and using a confusingly similar product numbering system — and the harm suffered by GPT Glendale as a result of those actions. Even if all of this conduct occurred only in New Hampshire, Kentek's actions have necessarily and intentionally caused harm to a Rhode Island resident, GPT Glendale. These actions provide the foundation for GPT Glendale's claims of unfair competition, misappropriation of trade secrets, tortious interference, and trademark infringement. Because Kentek's actions were intentionally directed toward GPT Glendale in Rhode Island, it surely had "fair notice" that it might haled into this forum to answer for the tortious injury flowing from its deliberate conduct. *See Northeastern Land*, 988 F. Supp. at 59.

**b. Kentek's knowing unfair competition and trademark infringement satisfy the "fair notice" requirement.**

GPT Glendale's causes of action for unfair competition and trademark infringement arise in part from Kentek's display of GPT Glendale products and trademarks on Kentek's website, and the resulting misrepresentation that such GPT Glendale products are in fact being sold by Kentek. This Court and other district courts in the First Circuit have held that trademark infringement via a continuously available Internet website satisfies the relatedness requirement. *Swarovski Optik N. Am., Ltd. v. Euro Optics, Inc.*, C.A. No. 03-090ML, 2003 WL 22014581, at *5 (D.R.I. Aug. 25, 2003). Indeed, by analogy, infringement case law firmly establishes that



PRV_838285_1

advertising in the forum state satisfies the initial inquiry of relatedness. *Id.* (citing *Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 44 (D. Mass. 1997)).

There can be no question that Kentek's use on its website of GPT Glendale's registered trademarks and photographs of GPT Glendale products also meets the due process "fair notice" test. Until April 2006, when GPT Glendale terminated the distributorship agreement, Kentek was permitted to display GPT Glendale products and trademarks on its website (at least to identify genuine GPT Glendale products). Indeed, for nearly a decade, GPT Glendale reaped the substantial economic benefits of being one of GPT Glendale's few authorized distributors. Kentek was fully aware that it was not authorized to continue using these photographs and GPT Glendale trademarks after GPT Glendale terminated the distributorship agreement in April. Yet it continued to do so anyway. Kentek's knowledge — and its decision to continue using GPT Glendale's images and trademarks without GPT Glendale's authorization — surely amount to "fair notice" to Kentek that it could be called to answer for its wrongful conduct in Rhode Island courts.

In support of their motion to dismiss, Defendants address only those allegations of GPT Glendale's Complaint related to Kentek's website. Defendants seek dismissal based on the allegedly low number of sales into Rhode Island that Kentek's website has produced. (Def. Memo. at 3–5.) Certainly, portions of GPT Glendale's claims against Kentek arise out of and relate to the acts of unfair competition and trademark infringement committed by Kentek on its interactive website. But Kentek's contacts with Rhode Island are not limited to the simple operation of a website.

Even if GPT Glendale's Complaint were limited to activities on Kentek's website itself, jurisdiction would still be proper in this case. Assuming Kentek is correct in placing itself in *Zippo*'s "middle ground" of the possible spectrum of Internet website cases (Def. Memo. at 3–4),

*see Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), courts have held that jurisdiction does not depend solely on the number of Internet sales the defendant makes into the forum state. Rather, in deciding whether to exercise jurisdiction over a cause of action arising from the operation of Kentek's website, this Court must also consider Kentek's non-Internet activities directed toward the forum state. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 453 (3d Cir. 2003).

Thus, the court in *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824 (N.D. Ill. 2000) exercised jurisdiction over an Irish manufacturer based on its commercially interactive website even though the products purchased through the website could not be shipped into Illinois. The court identified a number of non-Internet contacts between the defendant and Illinois to support this decision. These contacts included the defendant's use of Illinois suppliers, its attendance at trade shows in Illinois, and its advertising in publications that circulated in the United States. *Id*. at 838. Additionally, in *Cecil McBee v. Delica Co.*, No. 02-198-PC, 2003 WL 1872907 (D. Me. April 14, 2003), the court exercised jurisdiction over a shop owner in Japan who operated a website accessible in the United States. There, the defendant shop owner had no stores, offices, or employees in the United States. Her website was written almost entirely in Japanese. And customers could not actually purchase products directly through the website. The court nevertheless found her subject to its jurisdiction because the website was accessible to residents of Maine, there was evidence that three residents of Maine had visited the website and placed orders by calling the defendant in Japan, and the defendant shipped products to Maine. *Id.* at *4.

Certainly Kentek's contacts with Rhode Island — both Internet and non-Internet — are far less tenuous than those found sufficient to establish jurisdiction in *Euromarket* and *Cecil McBee*. Here, Kentek admits that it has made at least some sales to Rhode Island residents

through its website. (MacMullin Aff. ¶ 3.) And while Kentek downplays its overall sales to Rhode Island customers, the MacMullin Affidavit describes no fewer than twenty sales by Kentek of certain products to Rhode Island residents over the past two and a half years. (MacMullin Aff. ¶¶ 4–7.) Add to these facts the Lase-R-Shield Confidentiality Agreement, the distributorship agreement, Kentek's decade-long business relationship with GPT Glendale, and its tortious conduct directed at GPT Glendale through channels both on- and off-line, and it becomes more than obvious that if jurisdiction existed in *Euromarket* and *Cecil McBee*, it most certainly exists here too.

**c. The breaches by Simmons and Pellegrini relate to their contacts with Rhode Island and made suit here foreseeable.**

The breaches by Simmons and Pellegrini and the resulting misappropriation of GPT Glendale's trade secrets arise directly out of their past employment with GPT Glendale in Rhode Island. It was here in Rhode Island that Simmons and Pellegrini obtained the information that they provided or inevitably will provide to Kentek. Their decisions to work for Kentek and impart their specialized knowledge to Kentek causes direct injury to their former employer in Rhode Island. Again, it is of no import that their tortious actions occurred in either New Hampshire or Florida rather than in Rhode Island. *Northern Laminate Sales*, 403 F.3d at 25. Where an individual engages in tortious acts that directly interfere with a Rhode Island corporation, it is clearly foreseeable that such activity would have a direct effect in Rhode Island. Such conduct, therefore, constitutes the requisite minimum contacts for the exercise of specific jurisdiction over Simmons and Pellegrini. *See Thompson Trading*, 123 F.R.D. at 428.

**B. Trying GPT Glendale's Claims in Rhode Island Is Reasonable and Does <u>Not Offend "Traditional Notions of Fair Play and Substantial Justice</u>."**

The third aspect of the First Circuit's specific jurisdiction analysis concerns the reasonableness of exerting jurisdiction over a non-resident defendant, and speaks to the due

process concern that trying a non-resident defendant in the forum state will not offend traditional notions of fair play and substantial justice. *Northeastern Land*, 988 F. Supp. at 59. Where a defendant "who has purposefully directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (citing *Burger King*, 471 U.S. at 477). Such considerations include: the burden on the defendant in appearing; the forum state's interest in adjudicating the matter; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several states in furthering fundamental substantive social policies. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980); *Northern Laminate Sales*, 403 F.3d at 26. An examination of these so-called "gestalt" factors easily illustrates that Defendants have no compelling case that jurisdiction in Rhode Island is unreasonable.

First, Rhode Island has a "demonstrable interest" in redressing the economic harm or tortious injury sustained in this state. *See McGee*, 355 U.S. at 223 (the forum state frequently will have an interest in providing an effective means of redress for its residents); *Branch Metal Processing, Inc. v. Boston Edison Co.*, 952 F. Supp. 893, 911 (D.R.I. 1996). The effective administration of justice also weighs in favor of holding all of the Defendants accountable in one action. Dismissal of one or several Defendants would lead to piecemeal litigation in several forums of the facts common to each, wasting judicial resources. *See, e.g., Branch Metal Processing*, 952 F. Supp. at 910-11 (fact that no other forum would have personal jurisdiction over all parties to the lawsuit contributed to finding that jurisdiction in Rhode Island was reasonable).

Moreover, courts have traditionally afforded great deference to a plaintiff's choice of forum. *Women & Infants Hosp.*, 394 F. Supp. 2d at 492; *Branch Metal Processing*, 952 F. Supp.

at 911. GPT Glendale chose Rhode Island as the most convenient forum for the effective resolution of its claims against Defendants. To be sure, it is always more burdensome for a defendant to be a party to litigation outside its home state. For Kentek and Simmons, having this case proceed in nearby Rhode Island presents no special or unusual burden. In *Women & Infants Hospital*, for example, this Court found that requiring a Connecticut-based corporation to litigate in Providence, Rhode Island, just 114 miles and a two-hour drive away, did not impose a special or unusual burden upon the defendant. 394 F. Supp. 2d at 493; *see also Branch Metal Processing*, 952 F. Supp. at 910-11 (requiring Massachusetts defendant to defend itself in Rhode Island would not result in special or unusual burden). Kentek, in Pittsfield, New Hampshire, is located 144 miles from Providence. Simmons, who lives in Concord, New Hampshire, is just 126 miles away. Only Pellegrini lives at any real distance from Providence. In balance, however, the burden placed on Pellegrini due to this distance does not make trying this case in Rhode Island unreasonable. *See, e.g., Nowak*, 94 F.3d at 718 (burden of defending suit in Massachusetts from Hong Kong not enough to render jurisdiction unreasonable).

## V. <u>CONCLUSION</u>

Kentek, Simmons, and Pellegrini have all chosen to avail themselves of the privilege of doing business in Rhode Island. Each has engaged in conduct injurious to a Rhode Island resident. These facts alone support this Court's exercise of personal jurisdiction over them. Accordingly, this Court should deny Defendants' Motion to Dismiss. To the extent that this Court does not find Kentek, Simmons, and/or Pellegrini subject to specific jurisdiction in Rhode Island, GPT Glendale respectfully requests that it be permitted to conduct a limited amount of discovery to determine if there are additional grounds for jurisdiction in this case before it is dismissed.

GPT GLENDALE, INC.

By its Attorneys,

/s/ Darlene K. Alt
/s/ Raymond M. Ripple

Darlene K. Alt (#6345)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 (fax)
dalt@eapdlaw.com
rripple@eapdlaw.com

Michael J. Lockerby (*admitted pro hac vice*)
Peter G. Mack (*admitted pro hac vice*)
Mark A. Salzberg (*admitted pro hac vice*)
FOLEY & LARDNER LLP
3000 K Street NW, Suite 500
Washington, DC 20007
(202) 672-5300
(202) 672-5399 (fax)

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that this document has been filed electronically on this 29th day of September, 2006, and is available for viewing and downloading to the ECF registered counsel of record:

James W. Ryan, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903
jwr@psh.com

Dennis J. Roberts, II
40 Westminster Street
Suite 305
Providence, RI 02903
droberts@djrlaw.com

Mel B. O'Reilly
7125 Prospect Place NE
Albuquerque, NM 87110

/s/ Raymond M. Ripple

Raymond M. Ripple