UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GPT GLENDALE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>KENTEK CORPORATION, a New Hampshire corporation;<br><br>WILLIAM L. ARTHUR, an individual resident of New Mexico;<br><br>BONNIE G. SIMMONS, an individual resident of New Hampshire;<br><br>RICHARD L. PELLEGRINI, an individual resident of Florida,<br><br>Defendants. | ) | C.A. No. 06-334-ML |

**GPT GLENDALE'S MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

Plaintiff GPT Glendale, Inc. ("GPT Glendale"), pursuant to Fed. R. Civ. P. 65(a), respectfully moves this Court for the entry of a preliminary injunction against Defendants Kentek Corporation ("Kentek"), William L. Arthur, Bonnie G. Simmons, and Richard L. Pellegrini (collectively, "Defendants"). A proposed Order granting GPT Glendale's motion is submitted as Exhibit B to GPT Glendale's Memorandum of Law. The preliminary injunction sought by GPT Glendale would prevent Defendants from continuing to misappropriate GPT Glendale's trade secrets and from continuing to breach their contractual and common law duties to GPT Glendale. It would also enjoin Kentek from continuing to engage in acts of unfair competition and from tortiously

interfering with GPT Glendale's existing contracts and prospective business relationships.

In support of this motion, GPT Glendale relies upon the accompanying Memorandum, the Affidavit of Mark McLear, and the Verified Complaint (including exhibits to the foregoing).

Pursuant to Fed. R. Civ. P. 26(d), GPT Glendale also respectfully requests that any discovery necessary to decide its preliminary injunction motion be expedited so that it can be completed within four months. Otherwise GPT Glendale will suffer additional irreparable harm for the reasons set forth in the Verified Complaint, McLear Affidavit, and Memorandum in Support of GPT Glendale's Motion for Preliminary Injunction and Expedited Discovery.

GPT GLENDALE, INC.

By its Attorneys,

/s/ Darlene K. Alt

Darlene K. Alt (#6345)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 (fax)
dalt@eapdlaw.com
rripple@eapdlaw.com

Michael J. Lockerby (*admitted pro hac vice*)
Peter G. Mack (*admitted pro hac vice*)
Mark A. Salzberg (*admitted pro hac vice*)
FOLEY & LARDNER LLP
3000 K Street NW, Suite 500
Washington, DC 20007
(202) 672-5300
(202) 672-5399 (fax)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GPT GLENDALE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>KENTEK CORPORATION, a New Hampshire corporation;<br><br>WILLIAM L. ARTHUR, an individual resident of New Mexico;<br><br>BONNIE G. SIMMONS, an individual resident of New Hampshire; and<br><br>RICHARD L. PELLEGRINI, an individual resident of Florida,<br><br>Defendants. | C.A. No. 06-334-ML |

**MEMORANDUM IN SUPPORT OF GPT GLENDALE'S MOTION**
**<u>FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY</u>**

Darlene K. Alt (# 6345)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER & DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 (fax)
dalt@eapdlaw.com
rripple@eapdlaw.com

Michael J. Lockerby (admitted *pro hac vice*)
Mark A. Salzberg (admitted *pro hac vice*)
Peter Mack (admitted *pro hac vice*)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street NW, Suite 500
Washington, DC 20007
(202) 672-5300
(202) 672-5399 (fax)

# TABLE OF CONTENTS

*Page*


Table of Contents ........................................................................................................ i

I. PRELIMINARY STATEMENT.......................................................................... 2

II. PROCEDURAL BACKGROUND...................................................................... 5

III. PRELIMINARY INJUNCTION STANDARD............................................... 7

IV. ARGUMENT.......................................................................................................... 8

A. Defendants' Unfair Competition, Theft of Trade Secrets, Tortious Interference, and Breaches Threaten to Cause Irreparable Injury. ............... 8

1. Defendants' unfair competition threatens to cause GPT Glendale irreparable harm. ........................................... 8

2. Defendants' misappropriation of GPT Glendale's trade secrets threatens to cause irreparable harm. ........................... 11

3. Kentek's tortious interference with GPT Glendale's contracts and business relationships threatens to cause irreparable harm. ........................................................................................... 13

B. Because Defendants Will Suffer No Cognizable Harm If Enjoined, the Balance of the Hardships Tips Decidedly in Favor of GPT Glendale.......................................................................................... 13

C. GPT Glendale Can Easily Show the Requisite Likelihood of Success on the Merits of Its Claims Against Defendants........................ 16

1. GPT Glendale is likely to succeed on the merits of its unfair competition claims (Counts I and II)................................................. 17

a. Kentek is making misleading representations of fact that are likely to cause confusion........................................... 18

b. Kentek's conduct violates the common law of unfair competition because it is confusing and misleading. ........... 21




PRV_838818_1

c. Evidence of actual customer confusion further supports granting GPT Glendale preliminary injunctive relief. ........ 22

2. GPT Glendale is likely to succeed on its misappropriation of trade secrets and related claims of breach (Counts IV–VIII). ........ 24

a. GPT Glendale's confidential information constitutes protectable trade secrets as a matter of law. ........ 24

i. GPT Glendale's confidential information is sufficiently secret to be protectable. ........ 26

ii. GPT Glendale's trade secrets derive economic value from not being known by its competitors. ........ 28

b. Arthur, Simmons, Pellegrini, and Kentek obtained GPT Glendale's trade secrets by improper means. ........ 29

i. Simmons and Pellegrini owe a continuing duty of confidentiality to GPT Glendale. ........ 29

ii. Arthur has both a contractual and a fiduciary duty not to disclose or use GPT Glendale's trade secrets. ........ 30

c. Arthur, Simmons, and Pellegrini misappropriated GPT Glendale's trade secrets by using them to benefit Kentek. ........ 32

d. Kentek has used "improper means" to obtain access to and use GPT Glendale's trade secrets. ........ 35

3. GPT Glendale is likely to succeed on the merits of its tortious interference claims (Counts IX & X). ........ 37

D. The Public Interest Warrants a Preliminary Injunction Against Unfair Competition, Trade Secret Misappropriation, and Other Misconduct. ........ 39

1. Both the Lanham Act and the common law reflect the public interest in preventing unfair competition. ........ 39

2. The Uniform Trade Secrets Act reflects the public interest in protecting the confidentiality of GPT Glendale's trade secrets.......... 40

3. Protecting GPT Glendale's contracts and relationships from tortious interference and breach is in the public interest.......... 41

E. This Court Should Exercise its Fed.R.Civ.P. 26(d) Discretion to Expedite Discovery to Minimize the Harm to GPT Glendale.......... 41

F. If It Would Not Unduly Delay the Preliminary Injunction Hearing, GPT Glendale Would Not Object to Rule 65(a)(2) Consolidation. .......... 44

V. CONCLUSION.......... 45

Plaintiff GPT Glendale, Inc. ("GPT Glendale"), by counsel, respectfully states as follows in support of its motion for a preliminary injunction — pursuant to Fed. R. Civ. P. 65, 15 U.S.C. § 1116, and principles of equity — against Defendants Kentek Corporation ("Kentek"), William L. Arthur ("Arthur"),[1] Bonnie G. Simmons ("Simmons"), and Richard L. Pellegrini ("Pellegrini" and, collectively, with Arthur and Simmons, the "Individual Defendants") to prevent further unfair competition in violation of both the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.* (the "Lanham Act") and the common law, misappropriation of trade secrets, breach of contract, breach of fiduciary duty, breach of loyalty, and tortious interference with actual and prospective business relationships. To the extent that Defendants contend and this Court finds that discovery is necessary to decide this motion, GPT Glendale respectfully requests that discovery be expedited pursuant to Fed. R. Civ. P. 26(d). Under the expedited schedule sought by GPT Glendale, any discovery relevant to GPT Glendale's preliminary injunction motion would be completed four months from now. GPT Glendale's preliminary injunction motion could be heard as soon thereafter as this Court's schedule permits. In this regard, GPT Glendale would have no objection to a consolidated trial and hearing on GPT Glendale's preliminary injunction motion pursuant to Fed. R. Civ. P. 65(a)(2) if consolidation would not delay this Court's consideration of the merits of the preliminary injunction motion.

---

[1] Regardless of whether this Court finds that GPT Glendale's claim for money damages against Arthur is subject to arbitration, this Court can and should afford GPT Glendale with preliminary injunctive relief against Arthur pending arbitration.

## I. PRELIMINARY STATEMENT

Until recently, Kentek was an authorized distributor of GPT Glendale's laser protective eyewear products. Since approximately 1997, GPT Glendale trusted Kentek to use its best efforts to promote GPT Glendale's products. GPT Glendale now knows, however, that its trust in Kentek was misplaced.

Other than GPT Glendale itself, the only source of ***genuine*** GPT Glendale products is an authorized distributor. Kentek was, until April 14, 2006, one of a handful of such authorized distributors (and indeed was the largest one). Rather than use its best efforts to promote genuine GPT Glendale products, Kentek has been engaged in a deceptive scheme of "bait and switch." The "bait" has included GPT Glendale's federally registered trademarks, photographs of GPT Glendale products, and product numbers similar to those used by GPT Glendale — all intended to deceive customers into thinking that the products came from GPT Glendale. Upon attracting customers with such "bait," Kentek has "switched" them to knock-off products manufactured by one or more offshore suppliers. In at least one instance, these knock-off products also infringe patents held by GPT Glendale. Kentek's disloyalty prompted GPT Glendale to terminate the distributorship effective April 16, 2006.

Unfortunately, Kentek's acts of unfair competition did not end with its termination as an authorized distributor. Notwithstanding demand letters sent by GPT Glendale, Kentek has persisted in its deceptive conduct. Kentek's persistence prompted GPT Glendale to commence this litigation and — as Kentek's bad acts have continued and in fact increased — to seek preliminary injunctive relief and expedited discovery. In this case, the likelihood of confusion is intensified by the fact that Kentek was, until

recently, still an authorized distributor. Since its termination, Kentek has done nothing to "come clean" with customers who believe, mistakenly, that Kentek is still authorized to distribute GPT Glendale products. To the contrary, Kentek's advertising — including photographs of GPT Glendale products and a product numbering system that mimics the numbers used to identify ***genuine*** GPT Glendale products — intentionally suggests an ongoing relationship.

The harm to GPT Glendale is further compounded by the fact that Kentek has used "inside information" to engage in such unfair competition. This "inside information" includes GPT Glendale's trade secrets to which Kentek gained access by feigning interest in purchasing GPT Glendale's Lase-R-Shield business unit. Lase-R-Shield acts as a distribution arm for GPT Glendale products throughout the United States. To gain access to these trade secrets, Kentek signed a Mutual Confidentiality Agreement on November 22, 2002 (the "Lase-R-Shield Confidentiality Agreement"). It took Kentek until 2004 to announce that it really was not interested in acquiring Lase-R-Shield after all — at least not as part of a transaction in which Kentek would pay any money.

Having already obtained access to and later using many of GPT Glendale's trade secrets in violation of the Lase-R-Shield Confidentiality Agreement, Kentek then proceeded to gain access to other trade secrets in other improper ways. These include hiring (or otherwise obtaining the services) of several former employees of GPT Glendale, including the Individual Defendants. In violation of their contractual, fiduciary, and other duties to GPT Glendale, the former employees named as Individual

Defendants have assisted Kentek in misappropriating GPT Glendale's trade secrets in furtherance of Kentek's unfair competition and tortious interference.

Before filing suit, GPT Glendale sent "cease and desist" letters to both Kentek and one of the Individual Defendants, Arthur. (Compl. ¶¶ 39, 47 & 51, Exs. E, G & H.) Suffice it to say that the response was not favorable (Compl. ¶ 40, Ex. F) — thus necessitating the commencement of this action.

These and other facts that establish GPT Glendale's very real need for preliminary injunctive relief are set forth in the Verified Complaint, which GPT Glendale incorporates herein by reference. For purposes of GPT Glendale's preliminary injunction motion, the factual allegations of the Verified Complaint must be taken as true. *See* 43A C.J.S. Injunctions § 327. Since filing the Verified Complaint, GPT Glendale has become aware of other acts of unfair competition that are reflected on Kentek's website and elsewhere. These other wrongful acts are described in the Affidavit of Mark McLear ("McLear Aff."), attached hereto as Exhibit A.

This misconduct by Kentek and the Individual Defendants has certainly caused GPT Glendale to lose sales and therefore profits. But the harm to GPT Glendale caused by Kentek's unfair competition, misappropriation of trade secrets, tortious interference, and other wrongful conduct is not limited to lost sales and profits. GPT Glendale also faces harm for which money damages alone could not make GPT Glendale whole. GPT Glendale has lost control of the reputation and goodwill associated with its trademarks and products, and of its valuable trade secrets. GPT Glendale also faces damage to its customer relationships — if not the loss of certain customer relationships altogether.

The harm faced by GPT Glendale is thus by its very nature irreparable. Under the circumstances, Kentek ought not be heard to complain that it would be harmed by being enjoined from engaging in conduct that is wrongful. Such a claim of "harm" is not even worthy of consideration in applying the "balance of hardships" test for preliminary injunctive relief articulated by the First Circuit.

The facts establishing GPT Glendale's irreparable harm and likelihood of success on the merits are admittedly more complicated than those raised by the typical preliminary injunction motion. The extent of wrongdoing by Kentek and the Individual Defendants is such that any preliminary injunction hearing is likely to be time-consuming for the Court. Judicial economy, the parties' resources, and the interests of justice would thus be served if this Court exercised its discretion to expedite discovery pursuant to Fed. R. Civ. P. 26(d) and — if doing so would not unduly delay the preliminary injunction hearing — to consolidate trial on the merits with the hearing on GPT Glendale's motion for preliminary injunction pursuant to Fed. R. Civ. P. 65(a)(2).

## II. PROCEDURAL BACKGROUND

GPT Glendale filed suit on July 21, 2006. Service was effected on Kentek on July 27, 2006, and on each of the Individual Defendants as follows: Arthur and Pellegrini on July 25, 2006; and Simmons on July 28, 2006. Thereafter counsel for GPT Glendale contacted counsel for Kentek, Simmons, and Pellegrini to seek their consent to obtaining final resolution of this dispute sooner rather than later. Opposing counsel would not consent to expediting discovery or trial, claiming that twelve to fifteen months of discovery would be necessary to prepare for trial.

It has since become apparent that Kentek and the Individual Defendants are in no hurry to reach the merits of this dispute any time soon. Kentek requested and was granted an extension of time to respond to the Verified Complaint. Rather than address the merits, Kentek has now filed a motion to dismiss for lack of personal jurisdiction. This dilatory tactic is wholly devoid of any merit. Kentek, based nearby in New Hampshire, had a distribution relationship with a company here in Rhode Island — GPT Glendale — for nearly a decade. During this time, Kentek sent orders to and from Rhode Island, received shipments of products from Rhode Island, made payments in Rhode Island, and otherwise transacted business in Rhode Island. By doing so, Kentek clearly subjected itself to jurisdiction here. The unfair competition, misappropriation of trade secrets, tortious interference, and other wrongful conduct of which GPT Glendale complains were all directed at GPT Glendale in Rhode Island. As a result, GPT Glendale has suffered injury in Rhode Island (among other places). And without the preliminary injunctive relief that it seeks, GPT Glendale faces additional irreparable harm in Rhode Island and elsewhere. Yet Kentek and the Individual Defendants[2] would have this Court believe that it would somehow offend due process if they have to answer for their wrongs in the state in which ***all of them*** have transacted business, ***all of them*** have infringed and misappropriated GPT Glendale's intellectual property and trade secrets, and ***all of them*** have otherwise caused competitive injury to GPT Glendale.

---

[2] All of the Individual Defendants were employed by GPT Glendale. The only one whose office was outside Rhode Island — Individual Defendant Arthur — remains on the payroll of GPT Glendale to this day.

The desire on the part of Kentek and the Individual Defendants to avoid answering for their perfidy is not a ***legitimate*** reason for this Court to delay addressing the merits of GPT Glendale's unfair competition, misappropriation of trade secrets, tortious interference, and other claims. The pervasiveness of the bad acts on the part of Kentek and the Individual Defendants is such that this is truly a case in which justice delayed would be justice denied.

## III. PRELIMINARY INJUNCTION STANDARD

To obtain the preliminary injunction that it seeks, GPT Glendale must establish that: (1) it is likely to succeed on the merits of its claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998). The second and third factors — irreparable harm to GPT Glendale and the balance of hardships — make up the heart of the preliminary injunction test in the First Circuit. The question is thus whether the harm that GPT Glendale will suffer without preliminary injunctive relief, in light of GPT Glendale's likelihood of success on the merits, outweighs any harm the injunction might cause Kentek and the Individual Defendants. *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987). "The more foreseeable the plaintiff's ultimate success, the less weight is to be given to the defendant's prospective loss." *SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 541-42 (1st Cir. 1976).

## IV. ARGUMENT

### A. Defendants' Unfair Competition, Theft of Trade Secrets, Tortious Interference, and Breaches Threaten to Cause Irreparable Injury.

Any one of the many "bad acts" at issue in this litigation — unfair competition, misappropriation of trade secrets, tortious interference, or breach of contractual obligations with respect to confidentiality and non-competition — would establish irreparable harm, both in fact and as a matter of law. Taken together, the orchestrated efforts by Kentek and the Individual Defendants to misappropriate GPT Glendale's goodwill, trade secrets, customer relationships, and other contractual rights present a forceful case for preliminary injunctive relief.

#### 1. Defendants' unfair competition threatens to cause GPT Glendale irreparable harm.

Both as a matter of law and in fact, Kentek's unfair competition threatens GPT Glendale with irreparable harm. In Lanham Act cases, the First Circuit has observed, "irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim." *I.P. Lund*, 163 F.3d at 33. Indeed, irreparable harm is presumed in cases under Section 43(a) where the "defendant is wrongfully trading on the plaintiff's reputation," or where the "defendant's representations are literally false." *See Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 14-15 (1st Cir. 1986). Even without this presumption of irreparable harm, the facts alleged in the Verified Complaint establish the threat of irreparable harm that GPT Glendale faces. Such harm has already occurred and will continue if Kentek and the Individual Defendants are not enjoined.

Without preliminary injunctive relief, GPT Glendale will continue to suffer irreparable injury as a result of Kentek's use of GPT Glendale's products as "bait" to attract customers and then "switch" them to Kentek's knock-offs of indeterminate origin. Kentek's "bait and switch" has caused GPT Glendale to lose control of its goodwill and reputation. By its very nature, injury to goodwill and reputation is not easily measured or fully compensable in money damages and is therefore irreparable. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured for fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable."); *see also Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 197 (4th Cir. 1977) (it is impossible to ascertain with any accuracy the extent of harm caused by "word-of-mouth grumbling of customers"; such harm is thus incalculable). Each time Kentek sells a product to a customer that is confused or deceived as to whether the product came from GPT Glendale, GPT Glendale suffers inevitable, irretrievable, and irreparable degradation of its goodwill among its customers. *See Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 65 (2d Cir. 1985) (affirming district court's grant of injunction in part based on finding that "curiously similar" marks in the same line of business likely to cause irreparable harm).

GPT Glendale is also harmed each time that Kentek provides an unwary customer with a product that the customer believes to be a GPT Glendale product but is in fact an imitation, likely of inferior quality. Customers disappointed by the quality of the product they receive will assume that GPT Glendale has created an inferior product.

By virtue of the longstanding distribution relationship between GPT Glendale and Kentek, customers may also believe that GPT Glendale was somehow complicit in Kentek's "bait and switch." The resultant injury to GPT Glendale's reputation and goodwill is compounded by the fact that GPT Glendale is the only major manufacturer of laser protective eyewear that offers a lifetime guarantee on its frames. Customers attracted to similar frame styles offered by Kentek do not receive this lifetime guarantee when they purchase Kentek's substitute products. They may be unaware of this fact, however, until they seek to enforce the guarantee.

The damage to GPT Glendale would be equally severe even if Kentek's knock-off products were ***not*** inferior to GPT Glendale's products. The First Circuit and other courts have found irreparable harm when the trademark owner — in this case, GPT Glendale — loses the opportunity to control or oversee the quality of the goods being produced and sold in a manner that suggests that company's sponsorship of the products. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 643 (1st Cir. 1992). This is true regardless of the offending good's actual quality. *Id.*; *see also Truck Equip. Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1216 (8th Cir. 1976) ("The fact that the products are of equal quality is not of dispositional significance") citing *Am. Precast Corp. v. Maurice Concrete Prod., Inc.*, 360 F. Supp. 859, 864 (D. Mass. 1973), *aff'd* 502 F.2d 1159 (1st Cir. 1973). That is why, in *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), *cert. denied*, 484 U.S. 817 (1987), the Second Circuit held that goods manufactured by the holder of a trademark — but distributed without

authorization of the trademark holder — could not be considered "genuine" under the Lanham Act:

> One of the most valuable and important protections afforded by the Lanham Act is ***the right to control*** the quality of the goods manufactured and sold under the holder's trademark. For this purpose the actual quality of the goods is irrelevant; it is ***the control of quality*** that a trademark holder is entitled to maintain.

*Id*. at 395 (citations omitted) (emphasis supplied).

The First Circuit has also found damage even if the purchaser knows it is buying a knock-off product, as consumers who did not actually purchase the product but use it may still be confused. *I.P. Lund*, 163 F.3d at 44. Such secondary consumers might find themselves unimpressed with the quality of the product and thus unwilling to purchase the genuine article. *Id*.

Kentek's unfair competition further harms GPT Glendale by misappropriating GPT Glendale's customer relationships. As a result of Kentek's deception, revenue that would have gone to GPT Glendale now goes to Kentek. Customers accustomed to purchasing genuine GPT Glendale products through Kentek may not take the affirmative steps necessary to return to an authorized GPT Glendale distributor.

**2. Defendants' misappropriation of GPT Glendale's trade secrets threatens to cause irreparable harm.**

GPT Glendale has suffered and will continue to suffer irreparable harm from the misappropriation of its trade secrets by Kentek and the Individual Defendants. This misappropriation breaches contractual obligations and/or duties of loyalty owed by Kentek and each of the Individual Defendants. Courts have long recognized that the irreparable injury resulting from the misappropriation of trade secrets includes the loss

of the competitive advantage carved out by the owner of those secrets through the expenditure of effort, time, and money to develop them and that injunctive relief is appropriate to redress such injury. *See, e.g., TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28-29 (D. Mass. 2004) (developer likely to prevail on claim that design was protectable trade secret for purposes of obtaining preliminary injunction; unique design gave developer competitive advantage in marketplace). The Uniform Trade Secrets Act as enacted in Rhode Island and other states reflects the recognition that irreparable injury results from the misappropriation of trade secrets. The Uniform Trade Secrets Act thus specifically provides for the availability of injunctive relief for actual or threatened misappropriation. *See* R.I. Gen. Laws § 6-41-2(a). As a matter of Rhode Island law, disclosure or use of a trade secret — or even an apparently inevitable use or disclosure — presents a sufficient threat of harm to warrant judicial relief. *Read & Lundy, Inc. v. Washington Trust Co.*, No. PC99-2859, 2002 WL 31867868, at *10 (R.I. Super., Dec. 13, 2002) ("there is, as a matter of law, sufficient harm or threat of harm in disclosure or use of a real trade secret to a competitor for a cause of action to accrue.").

Here, there is ample evidence of Kentek's ongoing disclosure and use — as well as future inevitable disclosure and use — of GPT Glendale's trade secrets. This evidence, set forth in the Verified Complaint and in the accompanying McLear Affidavit, justifies the injunctive relief that GPT Glendale seeks. With access to GPT Glendale's trade secrets, Kentek can replicate GPT Glendale's market-proven methods of business, manufacturing, marketing, and distribution without having to invest the substantial time and expense typically required by a business to develop a credible

presence in the market. Kentek's resulting (and improper) "head start" gives it an immediate and irreparable unfair competitive advantage. Improper access to GPT Glendale's protectable customer and vendor lists also provides Kentek with immediate sales and marketing opportunities. Such access also allows Kentek both to anticipate GPT Glendale's prices and to pressure vendors into providing terms similar to those they provide GPT Glendale. These and other acts of unfair competition provide Kentek with an ill-gotten competitive advantage that has already caused and — unless enjoined — will continue to cause irreparable harm to GPT Glendale's business.

**3. Kentek's tortious interference with GPT Glendale's contracts and business relationships threatens to cause irreparable harm.**

Every sale that GPT Glendale loses as a result of Kentek's intentional and malicious practices causes GPT Glendale to suffer irreparable harm. Unlike lost sales, loss of customers and injury to customer relations is inherently irreparable. *See, e.g.*, *Ross-Simons*, 102 F.3d at 20; *Blackwelder*, 550 F.2d at 197. The current and potential customers whose relationships with GPT Glendale are at risk include customers that may view GPT Glendale as complicit in Kentek's "bait and switch," or may not even realize that the product they purchased is not a GPT Glendale product.

**B. Because Defendants Will Suffer No Cognizable Harm If Enjoined, the Balance of the Hardships Tips Decidedly in Favor of GPT Glendale.**

The hardships here tip emphatically in favor of GPT Glendale, which faces an inestimable loss of goodwill, sales, and profits, and injury to its reputation. GPT Glendale is an established business that has invested time, effort, and millions of dollars in the development of its laser protective eyewear and other product lines. By contrast, Kentek is a recent market entrant that seeks a "free ride" on GPT Glendale's investment.

GPT Glendale has no objection to ***legitimate*** competition from Kentek or anyone else. But Kentek's ongoing misappropriation of GPT Glendale's goodwill, trade secrets, and reputation threaten GPT Glendale with harm that is immeasurable, that cannot be compensated with money damages at a later date, and that results in long-term — if not permanent — injury. This harm to GPT Glendale is by its very nature irreparable and will continue absent an injunction.

By contrast, any potential hardships to the Defendants were brought about by their own unlawful acts. This type of harm to the Defendants is not even worthy of consideration under the balance of hardships test. For Kentek and the Individual Defendants to complain of harm resulting from being enjoined from violating the Lanham Act, misappropriating GPT Glendale's trade secrets, breaching their contractual and other obligations to GPT Glendale, and tortiously interfering with GPT Glendale's contractual relations "reminds us of the legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan." *Harbour Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n.5 (D.C. Cir. 1991).

Such an argument is contrary not only to principles of equity but also to well established principles of the law of trademarks and unfair competition. The law imposes upon Kentek, as a market newcomer, the duty to identify its products in a manner that will avoid the likelihood of confusion with products already in the market. *See Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1135 (2d Cir. 1982).

In this case, Kentek and the Individual Defendants have not simply breached this duty inadvertently. Rather, Kentek and Arthur in particular have willfully continued to breach this duty in the face of GPT Glendale's objections. Under the circumstances, the Defendants ought not be heard to complain of any such "harm" an injunction might cause them based upon their own unfair competition and other wrongful acts.

Moreover, as a new market entrant, Kentek could easily redesign its website and other marketing materials and reenter the market with very little — if any — long term damage. GPT Glendale's other competitors have managed for quite some time to market their products without infringing GPT Glendale's trademarks, misappropriating its trade secrets, and tortiously interfering with its contractual and business relations.

To the extent that Defendants can identify any harm that the preliminary injunction might cause them, such harm is best addressed with an injunction bond. *Munoz v. Porto [sic] Rico Ry. Light & Power Co.*, 83 F.2d 262, 269 (1st Cir. 1936), citing *Ohio Oil Co. v. Conway*, 279 U.S. 813, 815 (1929) (injunction should be granted where injury to opposing party "will be inconsiderable, or may be adequately indemnified by a bond"); *see also Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n.*, 35 F.3d 1134, (7th Cir. 1994) ("So long as an adequate bond is posted during the injunction, [defendant] will not suffer irreparable harm."); *Blackwelder*, 550 F.2d at 196 (risk of harm to opponent of preliminary injunction motion is easily addressed by a bond); *Masterfoods USA v. Arcor USA, Inc.*, 230 F. Supp. 2d 302, 313 (W.D.N.Y. 2002) (injunction bond would sufficiently protect defendant against possibility that court's preliminary injunction was improperly issued); *E-Bay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1068 (N.D. Cal. 2000)

("Any potential economic harm [to defendant] is appropriately addressed through the posting of an adequate bond.").

In short, the balance of hardships clearly favors the issuance of a preliminary injunction.

**C. GPT Glendale Can Easily Show the Requisite Likelihood of Success on the Merits of Its Claims Against Defendants.**

In determining the balance of hardships, this Court is also required by First Circuit precedents to take into account the strength of GPT Glendale's case. The greater the likelihood that GPT Glendale will succeed on the merits, the less consideration this Court should give to the harm that the injunction will cause Kentek and the Individual Defendants. *See Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-12 (1st Cir. 1988).

By expediting any discovery necessary to decide GPT Glendale's motion for preliminary injunction, this Court would have a fully developed record upon which to assess what the First Circuit views as the most important element of the preliminary injunction four-step analysis: a showing that GPT Glendale is likely to succeed on the merits. *See, e.g., Ross-Simons*, 103 F.3d at 16 ("likelihood of success is the main bearing wall of the four-factor framework"); *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993) ("the sine qua non of [the four-factor] formulation is whether the plaintiffs are likely to succeed on the merits").

Even without the benefit of discovery, expedited or otherwise, GPT Glendale can easily show — based on the allegations of its Verified Complaint and the accompanying

McLear Affidavit — that it is likely to succeed on the merits of each of its claims against Kentek and the Individual Defendants.

**1. <u>GPT Glendale is likely to succeed on the merits of its unfair competition claims (Counts I and II)</u>.**

The conduct that gives rise to GPT Glendale's unfair competition claim under Section 43(a) of the Lanham Act includes (1) Kentek's unauthorized use of photographs of GPT Glendale's products in its advertisements and marketing materials; (2) Kentek's refusal to inform customers that it is no longer an authorized distributor of GPT Glendale products; and (3) Kentek's use of product numbers to identify certain knock-off products that are deceptively similar to product numbers adopted by GPT Glendale to identify genuine products. To prevail on its Lanham Act unfair competition claim, GPT Glendale must show that Kentek's conduct amounts to false designation of origin or false and misleading description of fact that is likely to result in confusion and mistake as to GPT Glendale's affiliation, association, sponsorship, or approval of Kentek, or as to the origin of the products sold by Kentek. 15 U.S.C. § 1125(a)(1)(A). Alternatively, or additionally, GPT Glendale is entitled to protection under Section 43(a) if Kentek's unauthorized use of GPT Glendale's products and product numbering system in Kentek's advertising and marketing materials misrepresents the nature, characteristics, qualities, or geographic origins of the goods, services, or commercial activities of Kentek and/or GPT Glendale. 15 U.S.C. § 1125(a)(1)(B). The Verified Complaint and the McLear Affidavit establish each of these alternative grounds for relief under Section 43(1) of the Lanham Act.

**a. Kentek is making misleading representations of fact that are likely to cause confusion.**

Kentek displays photographs of GPT Glendale products on its website next to Kentek's own product numbers and descriptions, thereby deliberately promoting GPT Glendale's products as its own. (*See* Compl. ¶¶ 68-73, 77-78, 87, 92-93; McLear Aff. ¶¶ 9-11, 13, 23-26, Exs. 1, 3-4, 8-10.) There can be no reasonable dispute that the use of these images in Kentek's advertising is — on its face — false and misleading. *See Schroeder v. Lotito*, 577 F. Supp. 708, 723 (D.R.I. 1983) ("first requirement of § 1125(a) is that the descriptions or representations be false"). The use of a photograph of a competitor's product to sell one's own product has been described as being "of the same economic nature as trademark infringement." *Truck Equip. Serv.*, 536 F.2d at 1215; *see also Bangor Punta Oper., Inc. v. Universal Marine Co.*, 543 F.2d 1107, 1109 (5th Cir. 1976) (the misappropriation of advertising material constitutes a federal tort of unfair competition under § 43(a) of the Lanham Act); *777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 105 F. Supp. 2d 56, 63 (E.D.N.Y. 2000) (use of photographs of plaintiff's product to advertise defendant's product in brochures and on defendant's website, coupled with deceptive product numbering system, sufficiently stated cause of action under § 43(a) of the Lanham Act). Kentek's advertising "must be seen as using the photograph … to trade upon … [GPT Glendale]'s reputation and confuse potential customers as to the source of origin of the [product] pictured on the sales literature." *Truck Equip. Serv.*, 536 F.2d at 1216. Like the defendant in *Truck Equipment Service*, Kentek is plainly violating Section 43(a) of the Lanham Act.

The likelihood of confusion is compounded by the fact that Kentek was — until recently — an authorized distributor of GPT Glendale's products. *See, e.g., Church of Scientology Int'l v. Elmira Mission*, 794 F.2d 38, 43-44 (2d Cir. 1986) ("The unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark. … [A] former … licensee's status increases the probability of consumer confusion."); *Volvo Trademark Holding Aktiebolaget v. AIS Constr. Equip. Corp.*, 162 F. Supp. 2d 465, 471 (W.D.N.C. 2001) ("When a former licensee or dealer continues to use a mark after its license has been revoked, a compelling case is presented because of the danger that the consuming public will believe the defendant is still an authorized representative of the mark holder.").

Although intent is not an essential element of a Lanham Act Section 43(a) claim, proof of Kentek's intent to deceive customers increases the likelihood of confusion. *Pignons S.A. de Mecanique de Precision v. Polaroid, Corp.*, 498 F. Supp. 805 (D. Mass. 1980); *see also Baker v. Simmons Co.*, 307 F.2d 458, 465 (1st Cir. 1962) (likelihood of confusion in trademark infringement case is enhanced by showing that defendant's selection of name or symbol was part of calculated or preconceived plan). GPT Glendale's Verified Complaint and the accompanying McLear Affidavit are replete with evidence of Kentek's intent to trade on its prior status as an authorized GPT Glendale distributor. Kentek has taken no steps to inform actual and potential GPT Glendale customers that it is no longer authorized to sell GPT Glendale products — even when customers have contacted Kentek specifically to purchase or reorder GPT Glendale products. Kentek's

failure to inform customers that it is no longer an authorized distributor of GPT Glendale's products — coupled with the photographs of GPT Glendale products on its website (*see, e.g.,* Compl. ¶¶ 51, 57, 68; McLear Aff. ¶¶ 9-11, 13, 23-26, Exs. 1, 3-4, 8-10) — leads customers to the false impression that Kentek is still affiliated with GPT Glendale, or that GPT Glendale otherwise sponsors or endorses Kentek. *See Matrix Essentials, Inc. v. Karol*, No. 89-C-9611, 1992 WL 142292 (N.D. Ill. June 17, 1992) (unauthorized distributor created misleading impression of manufacturer sponsorship when it took no steps to notify customers it was not part of manufacturer's distribution network).

Kentek further perpetuates the perception of this affiliation by using a product numbering system deceptively similar to that used by GPT Glendale. For example, Kentek offers a pair of LGT frames under the product number "UX-L506." GPT Glendale's product number for the equivalent LGT frames is "LS506:" "UX" appears to be short for "Uvex," a brand of protective eyewear marketed by one of GPT Glendale's affiliates. (*See* McLear Aff. ¶ 13, 25, Ex. 4.) Kentek's other products in the same product line are similarly tied to the original GPT Glendale product numbers. For example, Kentek's knock-offs of GPT Glendale's polymer frames — GPT Glendale model LSK-YAG/KTP — are designated with the product number "UXK-YAG-KTP." (*See* McLear Aff. ¶ 13, Ex. 3.) In other words, the product numbers are identical except for the substitution for the letters "LS" of the letters "UX" (again, apparently short for "Uvex"). To identify its knock-off of GPT Glendale's Light Speed® IPL eyewear product, Kentek uses the product number "IEGW-LTSPD" to evoke and trade on GPT Glendale's

federally registered Light Speed® trademark. (*See* McLear Aff. ¶ 23, Ex. 8.) These are only a few of the numerous examples of Kentek's deceptive product numbering system. The resulting harm to GPT Glendale is compounded by the fact that the Kentek products numbers are displayed alongside photographs of GPT Glendale products on Kentek's website — a website from which Kentek was, until recently, authorized to advertise and sell GPT Glendale products.

The differences between the product numbers that have long been used by GPT Glendale and those recently adopted by Kentek are subtle. To identify several of its products, Kentek has simply removed one character from an established GPT Glendale product number. Such subtle differences are precisely the type that heighten the presumption that customers are likely to be confused. *See Societe Des Produits Nestle*, 982 F.2d at 643 (customers are more likely to be confused as to the origin of different goods bearing a similar name or number); *777388 Ontario Ltd*, 105 F. Supp. 2d at 63 (defendant's "LM4" and "LM6" product numbers sufficiently similar to plaintiff's "PLM4" and "PLM6" products as to be likely to cause customer confusion). As in *777388 Ontario Ltd.*, Kentek's deceptively similar product numbering system wrongly suggests a continuing affiliation with GPT Glendale that inures to Kentek's benefit while harming GPT Glendale's goodwill and reputation with its customers.

**b. Kentek's conduct violates the common law of unfair competition because it is confusing and misleading.**

The same evidence that supports GPT Glendale's right to relief under Section 43(a) of the Lanham Act supports GPT Glendale's common law claim for unfair competition. Consistent with the common law of other states, Rhode Island law

requires a showing that a defendant's conduct reasonably tends to confuse and mislead the general public into purchasing the defendant's products when the actual intent of the purchaser is to buy those of the plaintiff. *See, e.g., National Lumber & Building Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002); *Fund for Community Progress v. United Way*, 695 A.2d 517, 521-22 (R.I. 1997). Here, the conduct at issue includes:

(1) Kentek's failure to inform current and potential customers that it is no longer an authorized distributor for GPT Glendale products;

(2) Kentek's use on its website of images of GPT Glendale products for the purpose of marketing knock-off products; and

(3) Kentek's adoption of a product numbering system that is in some cases, deceptively similar to GPT Glendale.

Such conduct tends to reasonably confuse the general public into believing that Kentek is associated or affiliated with GPT Glendale and that the products Kentek is selling are those pictured on the website, namely, GPT Glendale products. As a result, customers intending to purchase GPT Glendale products through GPT Glendale's former authorized distributor, Kentek, instead receive Kentek products.

**c. Evidence of actual customer confusion further supports granting GPT Glendale preliminary injunctive relief.**

There can be no question that, by its actions, Kentek intends to confuse customers into believing it has a continuing relationship with GPT Glendale to gain competitive advantage. Kentek's strategy has paid off, as actual confusion has already occurred in this case. To obtain a preliminary injunction, GPT Glendale need only show ***likelihood*** of confusion rather than actual confusion. *I.P. Lund*, 163 F.3d at 43

(preliminary injunction may be granted if party "can persuade the district court that it is likely to be able to demonstrate consumer confusion"). Evidence of actual confusion, however, "materially strengthen[s] a § 1125(a) case." *See, e.g.*, *Schroeder*, 577 F. Supp. at 723-24 ("neither actual confusion nor intent to mislead need be shown [though] such circumstances materially strengthen a § 1125(a) case"); *see also Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir. 2006) (evidence of actual confusion, while not essential, is "often deemed the best evidence of possible future confusion").

The actual confusion caused by Kentek is exemplified by an incident involving a long-time GPT Glendale customer, Pratt & Whitney. Pratt & Whitney, unaware that Kentek was no longer an authorized distributor of GPT Glendale products, contacted Kentek to reorder a specific GPT Glendale product. (Compl. ¶ 56.) Rather than informing Pratt & Whitney that it was no longer an authorized distributor for GPT Glendale, Kentek falsely informed this customer that it would take six to nine weeks to fill the order. (*Id.*) Luckily, Pratt & Whitney contacted GPT Glendale directly to inquire about the delay in Kentek's filling the order — as its orders were usually filled in a matter of days. GPT Glendale was therefore able to correct Kentek's misrepresentation to this particular customer. However, it is highly likely that other GPT Glendale customers have been and continue to be deceived by Kentek's false information and omissions. Such customer confusion will continue if Kentek is not enjoined from its acts of unfair competition.

**2. <u>GPT Glendale is likely to succeed on its misappropriation of trade secrets and related claims of breach (Counts IV–VIII)</u>.**

Defendants' acts of unfair competition are also actionable as misappropriation of trade secrets, breach of fiduciary duty, breach of duty of loyalty, and — in the case of Kentek and Arthur — breach of contract. To prevail on its claim for misappropriation of trade secrets under Rhode Island's Uniform Trade Secrets Act, GPT Glendale must show that Kentek and the Individual Defendants acquired, used, or disclosed GPT Glendale's trade secrets without authorization and with the knowledge — actual or constructive — that the trade secrets were obtained by improper means. R.I. Gen. Laws § 6-41-1(2); *see also Magnum Defense, Inc. v. Harbour Group Ltd.*, 248 F. Supp. 2d 64, 70 (D.R.I. 2003). "Improper means" include breach or inducement of a breach of a duty to maintain secrecy. R.I. Gen. Laws § 6-41-1(2). The allegations of the Verified Complaint establish that — when they breached their respective duties of loyalty and fiduciary and contractual duties to GPT Glendale — Kentek and the Individual Defendants misappropriated GPT Glendale's trade secrets.

**a. GPT Glendale's confidential information constitutes protectable trade secrets as a matter of law.**

The information at issue in this action includes

1. information necessary to manufacture GPT Glendale products (Compl. ¶ 45), including — for each product — the following:

    a. dye formula (Compl. ¶¶ 15, 42, 117);

    b. the product history for each of the dyes (Compl. ¶ 42);

    c. bill of materials (Compl. ¶¶ 15, 42, 117);

    d. sources of supply (Compl. ¶¶ 15, 42, 117); and

e. methods and techniques of production, including the manufacturing process (Compl. ¶¶ 45, 117);

2. GPT Glendale's customer database with information about current and prospective customers (Compl. ¶¶ 38, 45);

3. GPT Glendale's supplier and vendor lists (Compl. ¶¶ 42, 45); and

4. the methods of distribution used by GPT Glendale's Lase-R-Shield business unit (Compl. ¶ 24).

As a matter of law, this information constitutes protectable trade secrets. Under the Uniform Trade Secrets Act, a company's confidential information — including formulas, programs, devices, methods, techniques, processes — is deemed a protectable trade secret where that information derives independent economic value from not being generally known to or ascertainable by the company's competitors and where the company makes efforts reasonable under the circumstances to maintain the secrecy of the information. R.I. Gen. Laws § 6-41-1(4). Customer and vendor lists may also rise to the level of protectable trade secrets if they are confidential in nature, or if the list is accompanied by knowledge of the customers' specific needs not available from a non-confidential source. *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1057 (R.I. 1989); *see also Baris v. Steinlage*, No. C.A. 99-1302, 2003 WL 23195568, at *22 (R.I. Super. Dec. 12, 2003). A key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort, or expense." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 873 (N.D. Ill. 2001). Thus, where information is not

readily ascertainable from a public source but rather was developed over time through an employer's extensive business endeavors, the information is a trade secret.

**i. GPT Glendale's confidential information is sufficiently secret to be protectable.**

While GPT Glendale's products are made from commercially available supplies, various aspects of the know-how necessary to produce these products are all protectable trade secrets owned by GPT Glendale. Certain information — including formulas, processes, methods, techniques, and bills of material — is ***not*** in the public domain and cannot "be readily duplicated without involving considerable time, effort, [and] expense." *RKI, Inc.*, 177 F. Supp. 2d at 873. Because GPT Glendale is a market leader in laser protective eyewear products, knowledge of this information would greatly benefit GPT Glendale's competitors. This is especially true for a new market entrant like Kentek. By misappropriating GPT Glendale's trade secrets, Kentek has been able to bypass the time and expense necessary for a ***legitimate*** competitor to develop its own products, customer base, and distribution system. Instead, Kentek has been able to move directly into (unlawful) competition with GPT Glendale.

The allegations of the Verified Complaint establish that GPT Glendale employs efforts reasonable under the circumstances to maintain the secrecy of this information. These efforts include instituting employee policies regarding the protection of confidential information, the use of confidentiality agreements with certain employees, the disclosure of confidential information within the company on only a "need to know basis," and the storage of confidential materials in secure areas in both hard copy and electronic form. (Compl. ¶¶ 15, 119.) Courts have found such efforts sufficient to meet

the secrecy requirement. *See, e.g., RKI, Inc.*, 177 F. Supp. 2d. at 874 (trade secrets adequately protected where company disclosed secrets on a need to know basis, limited access to computer networks; stored hard and electronic copies of confidential materials in secure locations, and made use of confidentiality agreements and security cameras).

GPT Glendale's customer and vendor lists are also protectable trade secrets under Rhode Island law. To a certain extent, the identity of purchasers of laser protective eyewear products may be readily ascertained in the marketplace. But GPT Glendale's customer and vendor lists include additional proprietary and confidential information. Specifically, these lists include the names and addresses of all customers, potential customers, vendors, and their respective contact persons; historical sales information; details of pending sales quotations; year to date sales figures; and shipping, pricing, cost, and margin information. (McLear Aff. ¶ 6.) This additional information makes the contents of GPT Glendale's customer and vendor lists protectable under the Uniform Trade Secrets Act. *See, e.g., Home Gas Corp. of Mass. v. DeBlois Oil Co.*, 691 F. Supp. 567, 575 (D.R.I. 1987) (a customer's specialized requirements, contact points, and pricing policies constitute confidential information that could not be used to benefit a former employee at the employer's expense).

Developing relationships with customers and documenting all customer contacts is part of the duties and responsibilities of every GPT Glendale sales representative, including Defendant Arthur. It is the job of every GPT Glendale sales representative — including Defendant Arthur — to be aware of each customer's special and specific needs. This specialized information is key to GPT Glendale's sales business and is not

available from non-confidential sources. (McLear Aff. ¶ 7.) *See, e.g., Rego Displays, Inc. v. Fournier*, 379 A.2d 1098, 1110 (R.I. 1977) (knowledge of customer identities, along with appreciation of the customers' specific needs amounts to trade secret). Given the amount and type of information contained in GPT Glendale's customer and vendor lists, and the personalized information known by its sales force, Kentek could not replicate GPT Glendale's lists without a "significant expenditure of time, effort, and expense," making the lists protectable trade secrets. *RKI, Inc.*, 177 F. Supp. 2d at 874.

**ii. GPT Glendale's trade secrets derive economic value from not being known by its competitors.**

The confidential information at issue in this lawsuit has tremendous economic value. Knowledge of GPT Glendale's formulas, processes, techniques, and methods of production, marketing, and distribution would allow new market entrants to replicate GPT Glendale's business, production, and distribution models without investing the time and expense typically required to develop such business components. A new market entrant with access to such information would gain an immediate, unfair competitive advantage. Details of customer contacts and sales figures would provide valuable information to competitors as to sales and marketing opportunities. Information as to GPT Glendale's prices, costs, margins, and other financial data would further allow competitors to anticipate, match, and beat GPT Glendale's prices, harming GPT Glendale's ability to obtain business. Likewise, information as to the prices and other terms of GPT Glendale's relationships with vendors of goods and services would allow competitors to pressure the vendors to provide similar terms. *See RKI, Inc.*, 177 F. Supp. 2d at 867. Stated plainly, a competitor in possession of GPT Glendale's secret

information could unfairly compete with GPT Glendale through the use of such information. *Home Gas Corp.*, 691 F. Supp. at 575 (use of plaintiff's trade secrets would give defendants unfair competitive advantage).

**b. Arthur, Simmons, Pellegrini, and Kentek obtained GPT Glendale's trade secrets by improper means.**

Arthur, Simmons, and Pellegrini were each entrusted with GPT Glendale's trade secrets during the course of that employment by GPT Glendale. As a matter of law, these Individual Defendants had a duty to maintain GPT Glendale's trade secrets in confidence. *Abbey Medical/Abbey Rents, Inc. v. Mignacca*, 471 A.2d 189, 193 (R.I. 1984) (misuse of an employer's confidential information by a former employee constitutes unfair competition); *Rego Displays*, 379 A.2d at 1101 (same). This duty of loyalty did not end with the termination of their employment by GPT Glendale. These former employees owe GPT Glendale such a duty regardless of whether they — like Individual Defendant Arthur — entered into a non-competition agreement. *Colonial Laundries, Inc. v. Henry*, 138 A. 47, 48 (R.I. 1927) (use of confidential information by former employee is an abuse of former employer's confidence, even where employer failed to protect itself through a non-competition agreement).

**i. Simmons and Pellegrini owe a continuing duty of confidentiality to GPT Glendale.**

Both Simmons and Pellegrini owe GPT Glendale a common law duty of loyalty. Simmons was formerly a Materials Specialist for GPT Glendale. While with GPT Glendale, her responsibilities included coordinating the production of GPT Glendale's products. To perform her responsibilities, Simmons necessarily had access to GPT Glendale's vendor lists, as well as the formulas, bills of material, and product history for

each of the various dyes used to make GPT Glendale products — in short, to GPT Glendale's trade secrets. (Compl. ¶ 42.) Pellegrini, a former Vice President of GPT Glendale, knew the identity of key vendors. (Compl. ¶¶ 10, 45.) Pellegrini also had access to the proprietary process by which — using dyes and molding laser products — GPT Glendale manufactures laser protective eyewear and how each of the various aspects of the process are brought together to manufacture products for distribution. (*Id.*) Pellegrini currently is a paid consultant for Kentek. (*Id.*)

Entrusted with GPT Glendale's trade secrets, both Simmons and Pellegrini owed GPT Glendale an affirmative duty not to disclose such information to competitors. Under Rhode Island law, this duty of loyalty did not end when Simmons and Pellegrini left the employ of GPT Glendale. *See Colonial Laundries*, 138 A. at 48 (use of former employer's confidential information is abuse of confidence). Nor was it negated by the fact that neither was subject to a formal non-disclosure agreement. *Id*. (use of former employer's confidential information is abuse of confidence even in absence of non-competition agreement).

**ii. Arthur has both a contractual and a fiduciary duty not to disclose or use GPT Glendale's trade secrets.**

Arthur was General Sales Manager for GPT Glendale's Lase-R-Shield division, as well as Territorial Sales Manager for GPT Glendale generally. (Compl. ¶ 8.) In these positions, GPT Glendale entrusted Arthur with its confidential and proprietary customer information and relied on Arthur to enhance that information with his own personal knowledge of his customers' specialized needs. Like Simmons and Pellegrini,

Arthur owes GPT Glendale a common law duty not to disclose this information to GPT Glendale's competitors.

In addition to his common law duty, however, Arthur also owes GPT Glendale an affirmative duty of loyalty by virtue of the Arthur Employment Agreement. This contract contains non-disclosure, non-competition, and non-solicitation provisions. (Compl. ¶¶ 29-33.) By signing this contract and remaining on the payroll of GPT Glendale, Arthur agreed to refrain from engaging in any activities that would breach the Arthur Employment Agreement. In breach of both the Arthur Employment Agreement and his common-law duty of loyalty to GPT Glendale, Arthur steered at least one GPT Glendale customer to Kentek and failed to update GPT Glendale's customer database with information about current and prospective GPT Glendale customers. (Compl. ¶ 38.) This incident occurred after Arthur had already announced to GPT Glendale his intention to work for Kentek following termination of his employment with GPT Glendale. (Compl. ¶ 34.) Under the circumstances, it is reasonable to believe that Arthur planned on using this customer information — which he never recorded in GPT Glendale's customer database — for personal gain and the benefit of Kentek.

By engaging in this behavior while he was still employed by and on the payroll of GPT Glendale, Arthur also breached the fiduciary duty that he owed to GPT Glendale. As a matter of law, an employee owes a fiduciary duty to his employer with respect to the subject matter of the employment relationship. *Cahill v. Antonelli*, 390 A.2d 936, 939 (R.I. 1978). An employee breaches this fiduciary duty if he solicits his

employer's customers, appropriates his employer's personality, or entices co-workers away from his employer. *Baris*, 2003 WL 23195568 at *19. Arthur's disloyal actions — including the solicitation of GPT Glendale's customers for the benefit of Kentek — breached the fiduciary duty that he owes to GPT Glendale.[3]

**c. Arthur, Simmons, and Pellegrini misappropriated GPT Glendale's trade secrets by using them to benefit Kentek.**

The Individual Defendants have each used GPT Glendale's trade secrets to benefit Kentek without GPT Glendale's authorization and with full knowledge that they were under a duty to maintain such information in the strictest confidence. Under the circumstances, it is reasonable to infer that they will continue to misappropriate GPT Glendale's trade secrets if not enjoined by this Court.

To establish the Individual Defendants' liability for misappropriation of trade secrets, GPT Glendale need not present direct evidence. Rather, GPT Glendale need only "construct a web of perhaps ambiguous circumstantial evidence" from which the trier of fact may draw inferences which tend to show that it is "more probable than not" that what GPT Glendale alleges happened did in fact take place. *Q-Co. Ind., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985). Here, there is both direct and circumstantial evidence proving misappropriation by each of the Individual Defendants. Simmons, for example, since becoming a Kentek employee, has contacted at least one of GPT Glendale's vendors requesting that the vendor manufacture for Kentek products identical to those which it produced for GPT Glendale. (Compl. ¶ 44.)

[3] Arthur also breached his fiduciary duty to GPT Glendale by enticing his assistant, Karen Brown, to leave GPT Glendale and work for Kentek. (Compl. ¶ 35.) *See Baris*, 2003 WL 23195568 at *19

In view of the specialized knowledge that Simmons had of GPT Glendale's products, manufacturing processes, and vendors, her actions rise to the level of trade secret misappropriation. Additionally, since Simmons and Pellegrini began working for Kentek, Kentek has come out with numerous "knock-off" products similar or identical to GPT Glendale's products, and has begun to advertise such products on its website. This sequence of events makes it "more probable than not" (*Q-Co. Ind.*, 625 F. Supp. at 618) that Kentek has used information obtained from Simmons and Pellegrini in violation of their obligations to GPT Glendale to manufacture these knock-off products.

Arthur, too, while still employed by GPT Glendale, used his specialized knowledge of his customers to direct at least one such customer to Kentek. (Compl. ¶ 38.) During the last month of his active employment with GPT Glendale (he remains on the payroll to this day), Arthur failed to update GPT Glendale's customer database with relevant customer information. (*Id.*) These and other facts make it "more probable than not" (*Q-Co.*, 625 F. Supp. at 618) that Arthur provided that "specialized customer knowledge" to Kentek instead. Information regarding a customer's specialized needs is a protectable trade secret. By failing to provide this information to GPT Glendale, his employer, Arthur breached the Arthur Employment Agreement and violated his fiduciary duty to GPT Glendale.

Even without such direct and circumstantial evidence, GPT Glendale could establish the Individual Defendants' liability for misappropriation of trade secrets under the doctrine of inevitable disclosure. This doctrine recognizes that the trade

(employee breaches fiduciary trust if he entices co-workers away from his employer).

secret owner need not await proof of actual harm to obtain injunctive relief where a former employee's position at a competing company makes it inevitable that the employee will use the former employer's trade secrets in carrying out the functions of the employee's current position. *RKI, Inc.*, 177 F. Supp. 2d at 875-76. The factors that determine whether disclosure of trade secrets is inevitable are: (1) the level of competition between the former employer and the new employer; (2) whether the employee's position with the new employer is comparable to the position held with the former employer; and (3) the actions the new employer has taken to prevent the new employee from using or disclosing trade secrets of the former employer. *Id*. at 876.

The inevitable disclosure factors are easily satisfied in this case. First, there is no dispute that GPT Glendale and Kentek are now direct competitors. Moreover, the current positions that Simmons and Pellegrini hold with Kentek are sufficiently similar to those they held with GPT Glendale as to make disclosure of GPT Glendale trade secrets inevitable. Simmons, former Materials Specialist for GPT Glendale, currently works in the same capacity for Kentek. It is thus unavoidable that she will rely on the knowledge she gained at GPT Glendale to carry out her current duties at Kentek. Similarly, Pellegrini, a former Vice President of GPT Glendale, is currently a consultant for Kentek. Pellegrini has extensive knowledge of GPT Glendale's key vendors and of the proprietary process by which GPT Glendale manufactures its products — including how the various aspects of the processes are brought together to manufacture products for distribution. These facts make it inevitable that Pellegrini will rely on GPT Glendale's trade secrets in providing guidance to Kentek's developing business. As to

the last element of inevitable disclosure, it is the defendant, Kentek, who bears the burden of proving it will not use or disclose a former employer's confidential information, as the defendant controls the evidence as to what duties its employees are assigned. *See RKI, Inc.*, 177 F. Supp. 2d at 876.

**d. Kentek has used "improper means" to obtain access to and use GPT Glendale's trade secrets.**

As with the Individual Defendants, there is both direct and circumstantial evidence that Kentek has also misappropriated GPT Glendale's trade secrets. First, the "web of … circumstantial evidence" makes it "more probable than not" (*Q-Co. Ind.*, 625 F. Supp at 618) that Kentek used GPT Glendale's confidential information obtained pursuant to the Lase-R-Shield Confidentiality Agreement for the unauthorized purpose of establishing its own distribution company to compete directly with GPT Glendale. The information that GPT Glendale provided to Kentek under the Lase-R-Shield Confidentiality Agreement contained protectable trade secrets regarding all aspects of GPT Glendale's distribution process, and was subject to a five-year non-disclosure provision. (Compl. ¶ 23.) This information was not publicly available, and could not be duplicated by Kentek without significant time, effort, and expense. Pursuant to the Lase-R-Shield Confidentiality Agreement, Kentek was permitted to use GPT Glendale's confidential information for the sole and limited purpose of assessing the prospective purchase of Lase-R-Shield from GPT Glendale. (Compl. ¶ 24.) Two years after entering into these discussions, Kentek abruptly broke off all negotiations. (Compl. ¶ 25.) Immediately thereafter, Kentek began hiring away key GPT Glendale employees, including the entire Lase-R-Shield sales unit. (Compl. ¶ 27.) Kentek, moreover, began

producing knock-off versions of GPT Glendale products, which it now sells through its own distribution network. (Compl. ¶ 26, 55.)

By using GPT Glendale's trade secrets for purposes other than those permitted by the Lase-R-Shield Confidentiality Agreement, Kentek has obtained them by "improper means" in violation of the Rhode Island Uniform Trade Secrets Act. *Home Gas Corp*, 691 F. Supp. at 575. In *Home Gas Corp.*, the Rhode Island Supreme Court held that a distributor would gain unfair competitive advantage over the retailer if allowed to use the knowledge gained through its relationship with the retailer for competitive purposes. *Id.* In that case, the retailer of liquid propane gas brought suit against a former distributor after the distributor used the retailer's proprietary customer lists to develop its own business in direct competition to the retailer. The customer list had been provided to the distributor for the sole purpose of effectuating the distributor relationship, and the information contained therein was subject to a two-year restrictive covenant. *Id.* Like the distributor in *Home Gas Corp.*, Kentek is misusing GPT Glendale's trade secrets — which were provided for a limited non-competitive purpose and subject to a five-year non-disclosure clause — to gain an unfair competitive advantage over GPT Glendale.

Kentek has further misappropriated GPT Glendale's trade secrets by systematically hiring away GPT Glendale's employees. Given the nature of the business in which GPT Glendale and Kentek operate, Kentek certainly knows that GPT Glendale's product formulas, the methods and processes of producing, marketing, and distributing its products, and its customer and vendor lists are all highly confidential.

Kentek also has every reason to know that GPT Glendale's employees entrusted with such information owe a duty to maintain such information in confidence. In addition to this general knowledge, Kentek was specifically informed of Arthur's contractual obligation not to disclose GPT Glendale's confidential information or otherwise compete with GPT Glendale in a letter dated March 23, 2006. (Compl., Ex. E).

Despite this knowledge, Kentek has employed former GPT Glendale employees in positions in which it is inevitable that they will make use of the specialized and secret information obtained during their employment by GPT Glendale. With full knowledge of the Arthur Employment Agreement, Kentek has nevertheless accepted the benefits of Arthur's disloyal conduct toward GPT Glendale. Through these actions, Kentek has accepted and used GPT Glendale trade secrets obtained improperly from the Individual Defendants. By affirmatively using these trade secrets, as well as those obtained pursuant to the Lase-R-Shield Confidentiality Agreement, Kentek has misappropriated GPT Glendale's trade secrets and will continue to do so if not enjoined.

**3. GPT Glendale is likely to succeed on the merits of its tortious interference claims (Counts IX & X).**

To prevail on its claim for tortious interference with contract, GPT Glendale must show (1) the existence of a contract; (2) that Kentek knew of the contract; (3) that Kentek intentionally interfered with the contract; and (4) that GPT Glendale has been damaged by that interference. *Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 752 (R.I. 1995). A defendant that intentionally and improperly interferes with a plaintiff's rights under a contract with another person is subject to tort liability "if the interference causes the

plaintiff to lose a right under the contract or makes the contract rights more costly or less valuable." *Jolicoeur*, 652 A.2d at 752.

The elements of tortious interference with prospective business relationships are identical to those of interference with existing contracts with one exception. For the latter tort, GPT Glendale need not prove the existence of a valid contract. Rather, GPT Glendale must establish either that "but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." *Mesolella v. City of Providence*, 508 A.2d 661, 671 (R.I. 1986). Malice, in the sense of spite or ill will, is not required for either tort. Rather, legal malice — an intent to do harm without justification — is all that is required. *Jolicoeur*, 653 A.2d at 753.

GPT Glendale is likely to succeed on the merits of its tortious interference claims against Kentek. As a former distributor, Kentek is fully aware of which customers customarily purchase GPT Glendale products. Kentek also knows that potential GPT Glendale customers contact it for the purpose of purchasing genuine GPT Glendale products. Customers do so because of Kentek's former authorized distribution relationship with GPT Glendale and the fact that Kentek continues to display photographs of GPT Glendale products — easily recognizable as such — on nearly every page of its website. By failing to inform these customers that it is no longer an authorized GPT Glendale distributor, and by accepting the business of these customers for itself, Kentek is interfering with the relationship between GPT Glendale and its customers. Kentek exacerbates the interference by providing false and misleading

information regarding the availability of GPT Glendale products. For example, Kentek has misinformed customers that GPT Glendale products are not currently available or are no longer being manufactured. There is no legal justification for Kentek's actions. These facts illustrate that Kentek has intentionally and improperly interfered with GPT Glendale's existing and prospective contractual relationships. And Kentek will continue to do so if not enjoined by this Court.

### D. **The Public Interest Warrants a Preliminary Injunction Against Unfair Competition, Trade Secret Misappropriation, and Other Misconduct.**

The fourth and final factor that this Court must consider in deciding GPT Glendale's motion whether the requested preliminary injunction will disserve the public interest. In this case, the preliminary injunction sought by GPT Glendale will in fact serve the public interest and thus weighs in favor or the preliminary injunctive relief sought. This otherwise private dispute between two commercial entities implicates (i) the public interest in preventing deception and confusion (the very purpose of Section 43(a) of the Lanham Act and common law prohibitions against unfair competition), (ii) the public interest in protecting trade secrets from misappropriation, and (iii) the public interest in the sanctity of contract — which the law protects from both tortious interference and breach.

#### 1. **Both the Lanham Act and the common law reflect the public interest in preventing unfair competition.**

First, the public interest is best served when the public is not deceived into purchasing products emanating from a bogus source. Indeed, this is the root purpose of the trademark laws. *See Borinquen Biscuit Corp.*, 443 F. 3d 112, 115 (1st. Cir. 2006) (as a matter of public policy, trademarks should be protected against infringing uses); *I.P.*

*Lund*, 163 F.3d at 36 ("The purpose of trademark laws is to prevent the use of the same or similar marks in a way that confuses the public about the actual source of the goods or services" and thus to "discourag[e] those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale."). As a new market entrant, Kentek could — and should — have worked to develop its own brand identity for its products. But instead, Kentek has been attempting to gain market share through blatant misappropriation of the good name of an established business, GPT Glendale. Kentek must be stopped if the public interest is to be served. Accordingly, the public interest tips decidedly in favor of granting GPT Glendale the preliminary injunction that it seeks.

**2. <u>The Uniform Trade Secrets Act reflects the public interest in protecting the confidentiality of GPT Glendale's trade secrets</u>.**

Like the Lanham Act and common law prohibitions against unfair competition, trade secret protection serves the public interest in maintaining open and fair competition between companies. The maintenance of standards of commercial ethics and the encouragement of invention are broadly stated policies behind Rhode Island's Uniform Trade Secrets Act. *See* R.I. Gen. Laws § 6-41-1 *et seq*. Restrictions upon an employee's or former employee's disclosure of information that was developed as a result of the employer's initiative and investment, and which was entrusted to the employee in confidence, are necessary to the maintenance of effective business standards. Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be compromised. Rather than afford access to confidential information, employers will be

compelled to limit their communication with employees with a consequent loss of efficiency. Failure to protect trade secrets entrusted to employees would only encourage business espionage, deceit, and fraud among employees.

The integrity of these important policies is at stake here. This Court should not permit Kentek, a new market entrant, to continue to misappropriate the trade secrets of an established competitor rather than work — as GPT Glendale did — to develop its own products, channels of distribution, and customer base. Accordingly, as with GPT Glendale's unfair competition claims, the public interest tips decidedly in favor of granting a preliminary injunction to protect GPT Glendale's trade secrets from misappropriation.

**3. Protecting GPT Glendale's contracts and relationships from tortious interference and breach is in the public interest.**

The public interest is best served through open and fair competition. Kentek's tortious acts of interference with GPT Glendale's current and prospective business relationships do not promote open and fair competition.

**E. This Court Should Exercise its Fed.R.Civ.P. 26(d) Discretion to Expedite Discovery to Minimize the Harm to GPT Glendale.**

For the same reasons that preliminary injunctive relief is warranted, this Court should exercise its discretion to permit the taking of discovery on an expedited basis. Federal Rule 26(d) grants this Court considerable discretion over the timing and sequence of discovery. Expedited discovery "is particularly appropriate in cases where preliminary relief is sought because of the expedited nature of injunctive proceedings." *See Ellsworth Assoc., Inc. v. Untied States*, 917 F. Supp. 841, 844 (D.D.C. 1996); *Advanced*

*Portfolio Tech., Inc. v. Advanced Portfolio Tech. Ltd.*, No. CIV 5620, 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994).

Some courts have implemented a four-part test to evaluate the viability of a party's request for expedited discovery. *See Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y 1982) (court should require plaintiff to demonstrate (1) irreparable injury, (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted). Other courts simply examine the discovery request "on the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 624 (N.D. Ill. 2000) ("where, as here, a plaintiff seeks expedited discovery in order to prepare for a preliminary injunction hearing, it does not make sense to use preliminary injunction analysis factors to determine the propriety of an expedited discovery request); *Entertainment Tech. Corp. v. Walt Disney Imagineering*, No. Civ. A. 03-3346, 2003 WL 22519440 (E.D. Pa., Oct. 2, 2003); *Pod-Ners, LLC v. Northern Feed & Bean of Lucern, Ltd.*, 204 F.R.D. 675, 676 (D. Colo. 2002) (Rule 26(d) allows the court to order expedited discovery upon a showing of good cause); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275 (N.D. Cal. 2002) (noting that *Notaro* was decided before the amendments to Rule 26); *Philadelphia Newspaper, Inc. v. Gannet Satellite Info. Network, Inc.*, No. Civ. A.

89-CV-2782, 1998 WL 404820 (E.D. Pa. July 15, 1998) (finding *Notaro* test inapplicable where parties anticipate later preliminary injunction determination).

It is unclear which test the First Circuit follows. Under either analysis, however, expedited discovery is warranted in this case. Under the *Notaro* test, for example, GPT Glendale has already demonstrated the first two factors — irreparable injury and a probability success of the merits — in connection with its motion for preliminary injunctive relief. As for the remaining factors, there is a clear connection between the expedited discovery and the avoidance of irreparable injury. Indeed, every day that Kentek is allowed to continue trading on GPT Glendale's goodwill and reputation results in increased and irreparable harm that will not be compensable with money damages. The discovery requested by GPT Glendale will relate directly to that harm. Moreover, the threatened irreparable harm to GPT Glendale is far greater than any harm Kentek will suffer due to expedited discovery. Indeed, an expedited process would actually serve minimize the harm to Kentek should this Court find against GPT Glendale by bringing this matter to a speedy resolution. *See Ellsworth*, 917 F. Supp. at 844.

Because GPT Glendale's motion satisfies the *Notaro* standards, the request for expedited discovery is reasonable. GPT Glendale's motion is reasonably timed, and made in connection with its motion for preliminary injunction. Expedited discovery is appropriate regardless of whether this Court consolidates the hearing on GPT Glendale's motion for preliminary injunction with trial on the merits. That way all parties can properly prepare for and present their arguments when the Court hears GPT

Glendale's motion for preliminary injunction. Moreover, the scope of the expedited discovery will be narrowly tailored to the time constraints under which both parties must proceed and to the specific issues that will have to be determined at the preliminary injunction hearing.

**F. If It Would Not Unduly Delay the Preliminary Injunction Hearing, GPT Glendale Would Not Object to Rule 65(a)(2) Consolidation.**

Federal Rule 65(a)(2) authorizes this Court to advance trial on the merits and consolidate the trial with the hearing on GPT Glendale's motion for preliminary injunction. *See Aponte v. Calderón*, 284 F.3d 184, 190 (1st Cir. 2002). Advancing trial on the merits often is appropriate when a preliminary injunction has been requested, as the urgency that is characteristic of cases involving preliminary injunctions makes a rapid determination of the merits especially important. *See* Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2950. Indeed, the addition of this provision to Rule 65 was intended to encourage the practice of consolidation. *Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980); *SEC v. Frank*, 388 F.2d 486 (2d Cir. 1968).

Rather than permit Defendants to prolong these proceedings, this Court should resolve this dispute on an expedited basis. The longer Kentek and the Individual Defendants are allowed to continue their acts of unfair competition, the greater — and the more irreparable — the harm will be to GPT Glendale. Expediting the trial and consolidating it with the preliminary injunction hearing are therefore in the interests of justice. For GPT Glendale, justice delayed is truly justice denied. If Kentek and the

Individual Defendants are in fact not doing what GPT Glendale alleges, they too should want this dispute behind them sooner rather than later.

Rule 65(a)(2) consolidation "can be exercised with particular profit when it appears that a substantial part of the evidence offered on application will be relevant to the merits and will be presented in such form as to qualify for admission on the trial proper." Advisory Committee Notes to 1966 Amendment of Rule 65, *reprinted at* § 65 App. 02[2]. Because consolidation of trial on the merits with the preliminary injunction hearing tends to save judicial resources, "[i]t should be employed whenever feasible." *Citizens to Preserve Foster Park v. Volpe*, 466 F.2d 991, 993 (7th Cir. 1972). If the Court can schedule trial on the merits at a relatively early date, Rule 65(a)(2) consolidation would be in the interests of justice in this case. Otherwise GPT Glendale respectfully requests a preliminary injunction hearing upon the completion of the expedited discovery that it seeks.

## V. <u>CONCLUSION</u>

In hindsight, GPT Glendale now knows why Kentek feigned interest in purchasing the Lase-R-Shield business, why Kentek's performance as a distributor and Arthur's performance as an employee both plummeted, and why Simmons and Pellegrini ended up in the employ of Kentek. Rather than ending Kentek's bad acts, the termination of its distribution relationship has only emboldened it and the Individual Defendants, prompting the filing of the Verified Complaint. In many cases, the commencement of litigation will prompt an infringer to clean up its act. But since the commencement of this litigation, the unfair competition, misappropriation of trade secrets, and tortious interference of which GPT Glendale complains have only

intensified — as evidenced by the accompanying McLear Affidavit. That is why GPT Glendale now seeks preliminary injunctive relief and expedited discovery.

Kentek's bogus challenge to personal jurisdiction makes its litigation strategy plain to see: delay these proceedings as long as possible while free-riding on GPT Glendale's investment in the laser protective eyewear business. It would be both inequitable and contrary to law for this strategy to be permitted to succeed. GPT Glendale therefore respectfully requests entry of a preliminary injunction preventing any further unfair competition, misappropriation of trade secrets, tortious interference, and breach by the Defendants. To the extent discovery is necessary to resolve this motion, GPT Glendale respectfully requests that discovery be expedited and that a hearing on GPT Glendale's preliminary injunction motion be scheduled as soon as practicable.

GPT GLENDALE, INC.

By its Attorneys,

/s/ Darlene K. Alt

Darlene K. Alt (#6345)
Raymond M. Ripple (#6489)
EDWARDS ANGELL PALMER
& DODGE LLP
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611 (fax)
dalt@eapdlaw.com
rripple@eapdlaw.com

Michael J. Lockerby (*admitted pro hac vice*)
Peter G. Mack (*admitted pro hac vice*)
Mark A. Salzberg (a*dmitted pro hac vice*)
FOLEY & LARDNER LLP
3000 K Street NW, Suite 500
Washington, DC 20007
(202) 672-5300
(202) 672-5399 (fax)

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document has been filed electronically on this 4th day of October, 2006, and is available for viewing and downloading to the ECF registered counsel of record:

James W. Ryan, Esq.
jwr@psh.com

Dennis J. Roberts, II, Esq.
droberts@djrlaw.com

Mel B. O'Reilly, Esq.
7125 Prospect Place NE
Albuquerque, NM 87110

W. Wright Danenbarger, Esq.
Danenbarger@wiggin-nourie.com

Thomas J. Pappas, Esq.
tpappas@wiggin-nourie.com

/s/ Darlene K. Alt

Darlene K. Alt